# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MARCUS DARNELL SIMMONS,

Defendant-Appellant.

UNPUBLISHED
January 22, 2015

No. 318564
Wayne Circuit Court
LC No. 13-004178-FC

Before: DONOFRIO, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316, assault with intent to commit murder, MCL 750.83, assault with intent to do great bodily harm less than murder, MCL 750.84, possession of a firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced, as a second habitual offender, MCL 769.10, to life in prison without parole for the first-degree premeditated murder conviction, 36 to 60 years' imprisonment for the assault with intent to murder conviction, 10 to 15 years' imprisonment for the assault with intent to do great bodily harm less than murder conviction, 5 to 7 ½ years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for the felony-firearm conviction. For the reasons set forth in this opinion, we affirm the convictions and sentences of defendant.

## I. BACKGROUND.

This appeal arises from a shooting on April 19, 2013, in Detroit, Michigan, which resulted in the death of one of the victims, Donte Mack. On April 19, 2012, at approximately 4 or 5:00 p.m., Faris Matti was working at the K & G Market on East Warren.[1] According to Matti, defendant came into the K & G Market every day, when defendant came in on April 19, 2013, Matti noted that defendant was wearing a jacket with a picture of President Obama's face stitched into the back. At approximately 8:45 p.m., Kila Parks drove herself, Donte Mack, and

---

[1] We note that in the record, various witnesses refer to the K & G Market by several names throughout the trial. In this opinion we refer the store as the "K & G Market."

their one-year-old daughter Dariyah Mack, to the K & G Market in Parks' Saturn. When they arrived at the K & G Market, Donte went straight inside and Parks noticed defendant standing against the K & G Market approximately 9 to 12 feet from where she was sitting in her car. At some point, Parks noticed that defendant entered the K & G Market through the side wearing a black "hoodie" sweatshirt. Inside the store, defendant purchased chips, threw money at Matti, and left the store.

Parks saw that Donte had come out of the K & G Market, so she unlocked her doors, when he got inside the car he locked the doors. Parks saw defendant walking behind Donte, and as soon as Donte locked the doors, she heard gunshots. Parks saw the bottom of defendant's pants and "hoodie" sweatshirt through the passenger side window of the car. Parks heard a total of 10 or 11 gunshots, which sounded like they came from the same gun and lasted for approximately 10 seconds. Matti also heard gunshots approximately 30 or 40 seconds after defendant left the store. Matti testified that he looked up and saw the shooting through the K & G Market's security camera.

After the shooting stopped, Parks saw defendant run, she then got out of the car and began to scream. Donte told her to grab Dariyah, he fell and sat down outside of the store, Parks took Dariyah into the K & G Market. During the shooting, Parks was shot twice in the leg, twice in the arm, once in the bladder, once in the kidney, and once in the liver. Dariyah was not injured.

Detroit Police Officer Michael Angeleri arrived at the scene and saw a car with the passenger side window shot or broken out. He also saw Donte lying face down at the entrance of the K & G Market. Donte and Parks were transported to the hospital by ambulance, but Donte was dead on arrival. Parks had surgery on her arm and bladder. After the incident, Parks was shown a photographic lineup and identified defendant as the shooter.

Detroit Police Officer Lance Sullivan arrived at the scene of the incident at approximately 11:00 p.m., and obtained surveillance videotape footage from the K & G Market. Several "screen shot" images of the videotape footage were admitted at trial. One image showed Donte at the counter of the K & G Market, while another image showed a person in dark clothing, a dark "hooded" jacket, and white shoes entering the K & G Market. The next image showed the person at the store counter, then the next images showed Donte walking toward the door of the K & G Market and exiting. The person in dark clothing then exited the store. Other images presented at trial showed a person wearing a "dark hood" standing at the passenger side door of a car extending his arm toward the door, an image showing a person with his right arm pointing and an image of a shadow on the sidewalk, and a "long item" appeared near the head of the person in the shadow. Additionally, the surveillance videotape recordings were also played at trial, and Officer Sullivan described what they depicted. One videotape recording showed an individual walk to a car parked at the K & G Market, and another individual approached the car. Two additional videotape recordings showed Donte leave the K & G Market, the man in the "hooded" sweatshirt leave, and a young woman come into the store with a young child shortly thereafter. Relative to the surveillance evidence, Matti informed the police that the video recording revealed that defendant was the person who started shooting.

-2-

Matti testified that on April 20, 2013, defendant came into the K & G Market. Matti telephoned the police, who searched the area and found defendant with a woman, DeAngela Kelly. Defendant was wearing a jacket with President Obama's picture on the back, he was immediately arrested and while conducting a search of his jacket, Detroit Police Officer Jarmiare McEntire, recovered 26 packages of marijuana.

DeAngela Kelly testified as defendant's alibi witness at trial, stating that she lived at 15736 Munich at the time of the incident, was a friend of defendant and her sister was defendant's girlfriend. Kelly further testified that defendant came to Kelly's house on April 19, 2013, at approximately 6 or 7:00 p.m., wearing a red shirt, blue jeans, and a coat. According to Kelly, defendant fell asleep on the floor of her bedroom, so she and her son went into another room to watch television. Kelly's sister arrived at her house at approximately 8:00 p.m., and she stayed at the house until sometime between 8:30 and 9:00 p.m. Kelly said defendant was at her house until she fell asleep at approximately 9:15 or 9:30 p.m., when she woke up around 1 or 2:00 a.m., defendant was no longer in her house. Defendant testified on his own behalf at trial, explaining that he and Donte were friends and there was no ill will between them. According to defendant, he went to the K & G Market at approximately 3:30 p.m. on April 19, 2013. He admitted that he was wearing the jacket with President Obama's face on it and further testified that he encountered Donte at the K & G Market, and Donte had given defendant advice because someone had tried to rob him earlier in the day. Defendant testified that he left the K & G Market at approximately 4:30 or 5:00 p.m and went to Kelly's house approximately one hour later, wearing a red T-shirt and blue "Mack" jeans, he said that he left his black "hoodie" sweatshirt and coat downstairs. Defendant testified that he left Kelly's house at approximately 9:15 or 9:30 p.m. because he had heard that there had been a shooting, so he went to the K & G Market where he said he stayed for 5 or 10 minutes. At approximately 9:40 p.m., defendant said he left the scene of the incident and partied with a woman named Ashley for the rest of the night.

Defendant testified that he sold medical marijuana, but he did not have a prescription to sell medical marijuana. Defendant also admitted to selling drugs on occasion while he was at the K & G Market, but that he never intended to sell the 26 bags of marijuana that were found in his coat when he was arrested. He also admitted at trial, that during a telephone conversation in jail, he said that Donte was the man he "wacked out." However, according to defendant's testimony, he meant to say: "Is that the one they said that I shot?"

The jury convicted defendant as outlined above. Defendant was then sentenced by the trial court as previously stated. This appeal then ensued.

## II. ANALYSIS.

On appeal defendant first argues that the trial judge exhibited bias in favor of the prosecution when he questioned six of the prosecution's witnesses. However, defendant did not object to the trial court's questioning of witnesses during the trial. A defendant must raise the issue of judicial bias in the trial court in order to preserve the issue for appellate review. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). Because there was no objection posited in the trial court relative to the trial judge asking questions, this issue is unpreserved. See *id*. This Court reviews an unpreserved claim of judicial bias for plain error affecting the defendant's substantial rights. *Id*. The requirements for plain error are: "1) error must have

occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).  An error affects the defendant's substantial rights if the defendant was prejudiced because the error affected the outcome of the trial.  *Id*.

A defendant is entitled to a neutral and detached magistrate during a criminal trial. *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996).  There is a "'heavy presumption of judicial impartiality.'" *Jackson*, 292 Mich App at 598 (citation omitted).  This Court examines whether a trial judge's actions unduly influenced the jury and deprived the defendant of his right to a fair trial.  *Id*.  "A trial court may question a witness in order to clarify testimony or elicit additional relevant information." *People v Weathersby*, 204 Mich App 98, 109; 514 NW2d 493 (1994).  See also MRE 614(b) ("The court may interrogate witnesses, whether called by itself or by a party.")  However, "[w]hile a trial court may question witnesses to clarify testimony or elicit additional relevant information, the trial court must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial." *Cheeks*, 216 Mich App at 480.  This Court has clarified that "[t]he test is whether the judge's questions and comments may have unjustifiably aroused suspicion in the mind of the jury concerning a witness' credibility and whether partiality quite possibly could have influenced the jury to the detriment of the defendant's case." *Id*.

On appeal, defendant first claims that the trial judge improperly questioned Parks, citing the following exchange:

> THE COURT: Ms. Parks, you drove the car, right?
> THE WITNESS: Yes.
> THE COURT: All right.  And Mr. Mack was in the passenger seat of the front seat?
> THE WITNESS: Yes.
> THE COURT: And do you remember where you parked the car when you pulled up in front of K & G Party Store?
> THE WITNESS: Yes, I do.
> THE COURT: If I gave you a little piece of paper, could you draw in for us where the car was?
> THE WITNESS: If I could.
> THE COURT: Okay.  You see it says K & G Party Store.
> THE WITNESS: Yes, and the sidewalk.
> THE COURT: And the sidewalk.  Okay.  Draw in for us where you parked your car.  Can you put an X where you first saw this person that ultimately wound up shooting? Put an X where he was standing.  Okay.  Now put an S, the letter S, where he was when the shooting started.  When this shooting took place, did the person who was doing the shooting say anything?
> THE WITNESS: No.
> THE COURT: When the shooting took place, Mr. Mack was already in the car?
> THE WITNESS: Yes.
> THE COURT: In the front seat, passenger side?
> THE WITNESS: Yes.
> THE COURT: You had never gotten out of the car by that time, had you?

-4-

THE WITNESS: No.

THE COURT: And your daughter was in the center of the back seat?

THE WITNESS: Yes.

THE COURT: So Mr. Mack was in between the shooter and your daughter?

THE WITNESS: Excuse me?

THE COURT: In the car there was a shooter that was outside; is that right?

THE WITNESS: Yes.

THE COURT: Mr. Mack was seated in the front seat on the passenger side, right?

THE WITNESS: Yes.

THE COURT: And your daughter was in the back seat, correct?

THE WITNESS: Yes.

THE COURT: So who was between the shooter and your daughter?

THE WITNESS: Mr. Mack, my child's father.

THE COURT: Right. Was there any particular reason why you were going to this K & G Party Store that night?

THE WITNESS: No. It's the neighborhood store.

THE COURT: No further questions. Redirect.

It is evident from this record that the trial judge was questioning Parks to acquire a better understanding of the position of the victims in the car. Additionally, the trial judge asked a single question as to why Parks had gone to the store that particular evening. Our review of this questioning does not reveal that the trial judge improperly questioned Parks. See *Cheeks*, 216 Mich App at 480. Rather, the trial judge's questions served to clarify Parks' testimony regarding the incident, and the trial court did not exhibit any bias or prejudice in questioning Parks. Nor can we find that the questions may have unjustifiably aroused suspicion in the mind of the jury concerning Parks' credibility. Accordingly, we assign no error.

Next, defendant argues that the questioning of Detroit Police Officer David Andrews regarding the caliber and make of the shell casings was prejudicial. Specifically, defendant cites the following exchange:

THE COURT: Officer Andrews, can you just return to your seat, please? The spent shell casings that you and your partner found outside of 15500 East Warren, were they all of the same caliber?

THE WITNESS: No, they weren't.

THE COURT: Look at the jury and speak into the microphone.

THE WITNESS: No, the casings were not -- they were of the same caliber. They were not of the same make. I'm sorry.

THE COURT: They were all of the same caliber, but not of the same make. And by "make," what are you talking about?

THE WITNESS: Manufacturer.

THE COURT: Okay. What was the caliber of the spent shell casing that you found?

THE WITNESS: If I can refer to my report.

THE COURT: Yes, you may.

THE WITNESS: The caliber was a .40 caliber shell casings.

-5-

THE COURT: Okay. Now, these were ammunition for a rifle or for a handgun.

THE WITNESS: For a handgun.

THE COURT: And generally speaking, there's two different types of handguns, right, a revolver and a semi-automatic?

THE WITNESS: That's correct.

THE COURT: And with a revolver you've got a cylinder and the bullets are put into the cylinder; is that right?

THE WITNESS: Yes.

THE COURT: Either five or six at a time?

THE WITNESS: Correct.

THE COURT: Okay. And when the handgun is fired that's a revolver, what happens to the shell casing?

THE WITNESS: The shell casings remain in the cylinder.

THE COURT: Okay, if the person is firing an semi-automatic, what happens to the shell casings?

THE WITNESS: The shell casings are ejected usually from the right port.

THE COURT: Okay. The firing mechanism from a revolver as contrasted with a semi-automatic, do you still have to pull the trigger each time it fires?

THE WITNESS: Yes, you do.

THE COURT: It's not like a machine gun where you pull the trigger once and it continually rapid fires, right?

THE WITNESS: Correct, that would be an automatic weapon.

THE COURT: That's an automatic weapon. So with a semi-automatic, you have to continue to pull the trigger each and every time; is that right?

THE WITNESS: Yes, that's correct.

THE COURT: And the total number of spent shell casings you found outside of this automobile on East Warren was how many?

THE WITNESS: Ten.

THE COURT: Redirect?

Again we cannot find any evidence that this line of questioning aroused suspicion in the mind of the jury concerning a witness' credibility and whether partiality quite possibly could have influenced the jury to the detriment of defendant's case. The questioning was merely eliciting information about the type of weapon used, the differences between an automatic and semi-automatic weapon and a revolver. Essentially, the trial court was asking Officer Andrews what he observed at the scene of the shooting. There is no evidence from this questioning of Andrews that the trial court was exhibiting bias or prejudice. See *Cheeks*, 216 Mich App at 480. Rather, the trial court's questioning of Officer Andrews was clearly intended to clarify what Andrews observed, as well as provide some additional information relative to different types of weapons. Accordingly, we assign no error.

Next, defendant argues that the questioning of Officer McEntire was prejudicial, citing the following:

THE COURT: Officer McEntire, where approximately was the defendant arrested?

THE WITNESS: He was arrested on -- if I could refer to my report.

-6-

THE COURT: Yes, yes.

THE WITNESS: He was arrested on East Warren approaching Balfour Street in the city of Detroit.

THE COURT: East Warren and Balfour?

THE WITNESS: Yes, sir.

THE COURT: And that would be approximately how far away from Nottingham and Warren?

THE WITNESS: Maybe a block or so. They're right in the general vicinity. He was, I want to say, maybe two and a half blocks from the store.

THE COURT: Okay. Redirect?

Again, we fail to see how this line of questioning exhibited bias or prejudice by the trial judge. The exchange between the witness and the trial judge was brief and simply intended to clarify the vicinity where defendant was arrested. None of the information elicited demonstrates prejudice to defendant. Additionally, the questions posed by the trial judge do not demonstrate any form of prejudice by the trial judge. Accordingly, we assign no error.

Next, defendant argues that the questioning of the officer in charge, Officer Nancy Foster, constituted error, citing specifically the following exchange:

THE COURT: Officer Foster, when you became involved in this incident, this investigation, you determined the significance of a house on Munich?

THE WITNESS: Yes.

THE COURT: What was the significance of that?

THE WITNESS: After getting the search -- the court order approved to go through the defendant's phone, I read his text messages, and he was advising different people to go to that location.

THE COURT: All right. Did you ever seek out a search warrant for that address on Munich?

THE WITNESS: Yes.

THE COURT: And was a search conducted of that house or building?

THE WITNESS: I'm sorry, what street are we speaking of again?

THE COURT: On Munich, on Munich.

THE WITNESS: Yes. I'm sorry, I have to review my file because I know I did a search warrant on either --

THE COURT: Go ahead.

THE WITNESS: I apologize. No, there was no search warrant for the Munich address.

THE COURT: And is there some reason why you never sought a search warrant for that Munich address?

THE WITNESS: There was no reason. I actually got a search warrant for the other location.

THE COURT: What other location?

THE WITNESS: The Chadsworth location. That would be his location that he hung out.

THE COURT: Well, didn't you have some information as to this address on Munich as being somewhat significant?

THE WITNESS: Yes.

THE COURT: What was the significance of it?

THE WITNESS: That he said he was staying there. Well, he was there from 6 o'clock P.M. to 1 o'clock A.M.

THE COURT: Well, wouldn't that be important then?

THE WITNESS: Well, not me because I didn't believe that he was actually there during the investigation.

THE COURT: Well, subsequently you came to find out that the defendant had filed an alibi witness notice; isn't that true?

THE WITNESS: Yes, that was just recent.

THE COURT: Okay, have you made any efforts to try to seek out a search warrant for that Munich address?

THE WITNESS: No, I didn't.

THE COURT: Redirect.

Here, the trial judge was questioning Foster to determine why the police did not search defendant's alibi witness, DeAngela Kelly's residence on Munich. Contrary to the assertions of defendant, this line of questioning likely favored defendant because it implied that the police should have searched the residence. See *Cheeks*, 216 Mich App at 480. Accordingly, we assign no error.

In addition, defendant asserts error when the trial judge questioned Bureau of Alcohol, Tobacco, Firearms, and Explosives Agent Stan Brue regarding the parameters of the area covered by a particular cellular telephone network tower. During direct examination, the prosecutor questioned Agent Brue regarding whether defendant's residence was located within the area covered by the tower. The trial judge sought to clarify Agent Brue's testimony regarding the area covered by the tower and sought additional information regarding the boundaries of the tower. See *Cheeks*, 216 Mich App at 480. The trial judge did not indicate that he was biased in seeking this additional information, and he did not intimidate or argue with the witness. See *id*. Again, we assign no error to this questioning.

Finally, the trial judge questioned Dr. Aveneesh Gupta of the Wayne County Medical Examiner's Office regarding Mack's injuries. The prosecution questioned Dr. Gupta during direct examination regarding the location of Mack's gunshot wounds. The trial judge then questioned Dr. Gupta regarding the entrance wound and the pathway that the bullet took through Mack's body. The trial judge also asked Dr. Gupta whether Mack had any other physical conditions and whether Mack could have recovered from the wound. The trial judge's questions to Dr. Gupta clarified Dr. Gupta's testimony regarding Mack's injuries and sought additional information regarding Mack's wounds. See *Cheeks*, 216 Mich App at 480. There is no indication that the trial judge's questions were intimidating, argumentative, or prejudicial because the trial judge merely sought information regarding Mack's wounds and did not imply that defendant caused the wounds. See *id*. We assign no error to this line of questioning.

After careful examination of defendant's assertions regarding the trial judge's questioning of various witnesses, we conclude that the questioning fell within the parameters of MCR 614(b). Additionally, though we caution the judge that his questioning must be restrained so that his questioning cannot be construed as intimidating, argumentative, prejudicial, unfair, or

partial, *Cheeks*, 216 Mich App at 480, we cannot find that any of the complained of questioning meets any of those listed criteria. Nor can we find that the trial judge's questions aroused suspicion in the mind of the jury relative to any of the witnesses' credibility. In sum, we cannot glean any prejudice or bias emanating from the trial judge's questioning of various witnesses.

Defendant next argues that the trial judge's instruction to several witnesses to look at the jury while he was questioning them, indicated that his questions were important. However, the trial judge's instruction to the witnesses served a far less dubious purpose: to ensure that the jurors heard the witnesses' answers and were able to observe the witnesses during questioning. The trial judge also instructed Officer Andrews to "[l]ook at the jury and speak into the microphone." The fact that the trial judge asked Officer Andrews to speak into the microphone illustrates that the trial judge sought to ensure that the jury could understand the witnesses. Thus, there is no indication that the trial judge instructed the witnesses to look at the jury whole answering his questions because of the trial judge's bias. See *Cheeks*, 216 Mich App at 480.

Additionally, defendant cannot establish prejudice because the trial judge instructed the jury that his questions, comments, and rulings are not evidence. The trial judge further instructed the jury that his comments or instructions are not meant to influence the jury's decision and do not express a personal opinion regarding the case. The trial court further explained that the jury should disregard any opinion that it believes that the trial judge has regarding the case. A jury is presumed to follow jury instructions. *People v McDonald*, 303 Mich App 424, 427; 844 NW2d 168 (2013). Therefore, defendant cannot establish that the trial judge's questioning affected the outcome of his trial. See *Carines*, 460 Mich at 763; *People v Davis*, 216 Mich App 47, 51-53; 549 NW2d 1 (1996) (holding that the trial judge's questions to the witnesses did not create judicial bias and noting that the trial judge instructed the jury that his questions to the witnesses were not evidence). For the reasons stated above, the trial judge's questioning of the six prosecution witnesses did not constitute plain error affecting defendant's substantial rights. See *Carines*, 460 Mich at 763.

Defendant next argues that he was denied a fair trial when the prosecutor questioned Officer McEntire regarding the fact that 26 packages of marijuana were found on defendant at the time of his arrest and questioned defendant regarding whether he sold and used drugs. Defendant further argues that the evidence was irrelevant and that any probative value that the evidence did have was substantially outweighed by the danger of unfair prejudice.

"In order to preserve a claim of prosecutorial misconduct for appellate review, a defendant must have timely and specifically objected below, unless objection could not have cured the error." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). Defendant did not object to the prosecutor's conduct in the trial court. Therefore, the issue is unpreserved. See *id*. This Court reviews an unpreserved claim of prosecutorial misconduct for plain error affecting the defendant's substantial rights. *Id*. As discussed above, the requirements for plain error are: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. An error affects the defendant's substantial rights when the error affected the outcome of the trial. *Id*.

A prosecutor commits prosecutorial misconduct if he or she deprives the defendant of a fair and impartial trial. *Brown*, 294 Mich App at 382. "Prosecutorial misconduct issues are

decided on a case-by-case basis, and the reviewing court must examine the record and evaluate a prosecutor's remarks in context." *Id.* at 382-383. "Under MRE 402, relevant evidence is admissible unless excluded by the state or federal constitution or by a rule of evidence." *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). Relevant evidence is defined as evidence with "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 236-237, quoting MRE 401. One exception to this rule, however, is that "'evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Id.* at 237, quoting MRE 403. This Court first determines whether the evidence was unfairly prejudicial, and then decides whether the probative value was substantially outweighed by the danger of unfair prejudice. *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011). The term "unfair prejudice" means the "tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Id.* (internal quotation marks and citations omitted). Additionally, "[u]nfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

The testimony related to the 26 packages of marijuana created the danger of unfair prejudice because there was a possibility that the testimony would be given undue weight by the jury. Officer McEntire testified that defendant possessed 26 packages of marijuana at the time of his arrest. The prosecutor also questioned defendant at length regarding whether he sold drugs to earn money, possessed 26 packages of marijuana at the time of his arrest, and had a license to sell medical marijuana. However, the testimony was highly relevant to the prosecution's case as it was evidence of motive. The prosecution questioned defendant regarding his connection with Mack:

> *Q.* Because Mr. Mack sold drugs as well, right?
>
> *A.* I never knew it.
>
> *Q.* You didn't know that he sold drugs?
>
> *A.* No.
>
> *Q.* You didn't know that Mr. Mack on occasion would sell drugs in the same neighborhood that you did?
>
> *A.* No, I don't pay attention to who sells drugs in my neighborhood, ma'am.
>
> *Q.* You don't pay attention to the opposing drug dealers that work in the same neighborhood?
>
> *A.* No, ma'am. I'm not in competition, so I don't pay attention to that.

*Q*. You would agree with me that the sale of drugs is an inherently dangerous occupation, right?

*A*. No, ma'am.

*Q*. Folks don't get killed over drugs everyday [sic]?

*A*. No, ma'am.

This line of questioning demonstrates that the prosecution's purpose in questioning Officer McEntire and defendant regarding defendant's marijuana possession and sales was to establish a motive for the shooting. The testimony was highly relevant because it connected defendant with the victims and tended to make the fact that defendant committed the shooting more likely than it would have been without the testimony. See *Schaw*, 288 Mich App at 236-237.

In addition, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. See *Schaw*, 288 Mich App at 237. Again, the testimony was highly relevant because it connected defendant with the victims and provided evidence of defendant's motive to shoot at Mack. See *id*. at 236-237. Furthermore, although there was a danger that the jury would view defendant negatively because he was a drug user and seller, the danger was not so great that it would distract the jury from considering whether defendant committed the charged offenses. See *Blackston*, 481 Mich at 462; *Cameron*, 291 Mich App at 612. Therefore, the prosecutor did not commit prosecutorial misconduct in questioning Officer McEntire regarding the fact that defendant had 26 packages of marijuana in his possession at the time of his arrest and in questioning defendant regarding whether he used and sold marijuana.

Even if this Court were to find prosecutorial misconduct in the eliciting of this information, defendant fails to show how the error affected the outcome of the trial. The trial court instructed the jury regarding the elements of the charged offenses, which did not include drug use or sale. The jury is presumed to have followed the jury instructions. See *McDonald*, 303 Mich App at 437. Therefore, the jury is presumed to have not considered defendant's drug use or sale in determining whether he was guilty of the charged offenses. See *id*. Additionally, there was substantial evidence presented at trial establishing that defendant committed the charged offenses. Parks identified defendant as the shooter. Faris Matti, an employee of the K & G Market, also identified defendant as the man who came into the K & G Market and then committed the shooting. There was a recording of a telephone conversation presented at trial, in which defendant stated that he had "wacked out" Mack. In addition, a videotape recording from the scene of the incident, which depicted the shooter and the shooting, was played at trial. Furthermore, defendant does not explain how he was prejudiced by the prosecutor's actions. See *People v Smart*, 304 Mich App 244, 251; 850 NW2d 579 (2014) ("An appellant may also not merely announce a position and leave it to this Court to rationalize the basis for the claim, or elaborate the argument.") Therefore, defendant was not prejudiced by the prosecutor's actions. See *Carines*, 460 Mich at 763.

Defendant next argues that defense counsel was ineffective for failing to object to the trial judge's questioning of the six prosecution witnesses and the prosecutor's questions regarding defendant's marijuana possession and sales.

A defendant preserves the issue of ineffective assistance of counsel by bringing a motion for a new trial or a *Ginther*[2] hearing in the trial court. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Defendant did not bring a motion for a new trial or a *Ginther* hearing in the trial court. Therefore, the issue is unpreserved. See *id*.

This Court reviews an unpreserved claim of ineffective assistance of counsel for "mistakes apparent on the record." *Brown*, 294 Mich App at 387. A claim of ineffective assistance of counsel involves issues of law and fact. *Id*. "This Court reviews a trial court's findings of fact, if any, for clear error, and reviews de novo the ultimate constitutional issue arising from an ineffective assistance of counsel claim." *Id*.

> To prevail on a claim of ineffective assistance of counsel, defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different, and (3) the resultant proceedings were fundamentally unfair or unreliable. [*Brown*, 294 Mich App at 387-388.]

There is a strong presumption that defense counsel's conduct constituted sound trial strategy. *Id*. at 388. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

As discussed above, the trial court did not err in questioning six of the prosecution's witnesses because the trial court merely elicited additional relevant information and clarified the witnesses' testimony. In addition, as discussed above, the prosecutor did not commit prosecutorial misconduct in questioning Officer McEntire regarding the fact that defendant possessed 26 packages of marijuana at the time of his arrest and in questioning defendant regarding whether he used and sold marijuana, because the probative value of the evidence was not outweighed by the danger of unfair prejudice. Therefore, defense counsel did not render ineffective assistance because an objection to the trial judge's conduct or the prosecutor's conduct would have been meritless. See *Ericksen*, 288 Mich App at 201.

Affirmed.

/s/ Pat M. Donofrio
/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).