# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CARL JOSEPH WARDELL,

        Defendant-Appellant.

UNPUBLISHED
August 2, 2018

No. 339569
Saginaw Circuit Court
LC No. 16-042834-FH

Before: RONAYNE KRAUSE, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

Carl Joseph Wardell appeals as of right his jury trial convictions of first-degree home invasion, MCL 750.110a(2), conspiracy to commit first-degree home invasion, MCL 750.110a(2), possession of burglar's tools, MCL 750.116, four counts of felon in possession of a firearm (felon-in-possession), MCL 750.224f, and five counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Wardell was sentenced as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of 23 to 50 years' imprisonment for the first-degree home invasion and conspiracy to commit first-degree home invasion convictions and 10 to 20 years' imprisonment for the possession of burglar's tools and felon-in-possession convictions, and to consecutive terms of 2 years' imprisonment for each felony-firearm conviction. We affirm.

## I. FACTUAL BACKGROUND

Wardell's convictions stem from a break-in that occurred at a residential home in Saginaw Township. While the homeowners were at work, Wardell and his nephew, Joseph Gornto, "ransacked" the home, stealing hunting supplies, firearms, ammunition, prescription medication, electronics, and jewelry, among other items. In the basement of the home, the police located an opened can of Sprite soda, which was subsequently found to have Wardell's DNA on it. The police also obtained surveillance footage from a nearby business that showed two suspects loading items into the trunk of an older model silver Chevrolet Malibu. One subject was positively identified as Gornto, and the Malibu was identified as belonging to Wardell's mother. When Michigan State Police troopers executed an arrest warrant at Wardell's home for another criminal matter a few weeks after the break-in, the troopers noticed prescription bottles belonging to one of the victims in Wardell's basement bedroom. A subsequent search of Wardell's basement and yard yielded numerous items from victims' home.

-1-

## II. LAY OPINION TESTIMONY

Wardell argues that the trial court abused its discretion in allowing Detectives Scott Jackson and James MacDonald to testify about surveillance footage shown to the jury. He contends that their testimony was not proper lay opinion testimony and that it invaded the province of the jury. We disagree. Wardell properly preserved this issue as to Jackson's testimony, so we review it for an abuse of discretion. *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013). However, because he did not preserve the issue as to MacDonald's testimony by raising this objection at trial, our review is for plain error affecting Wardell's substantial rights. *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

Under MRE 701, the opinion of a lay witness "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." However, "[w]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Perkins*, 314 Mich App 140, 161-162; 885 NW2d 900 (2016), superseded in part on other grounds sub nom *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016) (quotation marks and citation omitted). It is also well settled that witnesses are prohibited from expressing an opinion on a defendant's guilt. *Fomby*, 300 Mich App at 53.

In *Fomby*, a police officer's narrative description of a surveillance video and the identification of suspects in still images captured from the video were held to be admissible lay testimony. *Id*. at 49-53. On appeal, the defendant argued that, because his identity was at issue, the officer's testimony invaded the province of the jury. *Id*. at 48. This Court disagreed, explaining that the testimony was "rationally based on [the officer's] perception" of the video because he had watched the video multiple times and used it to produce the still images. *Id*. at 50-51. Further, this Court held that the officer's testimony was "intended to provide a clearer understanding" of whether the suspects had visited the scene before the crime, noting that the original video was approximately six hours long and that the officer reached his conclusions only after scrutinizing the entire video several times. *Id*. at 51-52. Finally, this Court explained that the testimony did not invade the province of the jury because the officer did not identify a suspect in the video as the defendant. *Id*. at 53. Rather, he merely opined that the individuals seen in a video of the crime were the same individuals seen in the still photographs he created from earlier surveillance footage. *Id*.

Conversely, in *Perkins*, this Court held that the trial court's decision to allow an officer's opinion testimony was an abuse of discretion. *Perkins*, 314 Mich App at 160. Unlike in *Fomby*, the officer in *Perkins* affirmatively identified the defendant as the person shown in a surveillance photograph. *Id*. at 160-161. This Court, quoting *Fomby*, 300 Mich App at 52, noted that " 'the issue of whether the defendant in the courtroom was the person pictured in a surveillance photo [is] a determination properly left to the jury,' " and that "[t]here was nothing about the images (i.e., poor quality of the images, defendant wearing a disguise) that necessitated [the officer's] opinion." *Perkins*, 314 Mich App at 161-162 (first alteration in original). Accordingly, the identification by the officer "invaded the province of the jury." *Id*. at 161. However, because evidence of the defendant's guilt was "overwhelming" and his identity was not in dispute, the error was "ultimately of no consequence." *Id*. at 162-163.

Jackson investigated the home invasion and testified that he watched the surveillance footage many times. During Jackson's direct examination, the prosecutor played surveillance clips for the jury, and the following exchange occurred:

> *Q.* What does this clip show?
>
> *A.* I am seeing two individuals, the same ones we saw earlier in the red shirt and the black shirt, coming out from the tree line. Looks like the trunk of the Malibu from what I can see was open. And retrieving items from the tree line and putting them in the vehicle.
>
> *Q.* So they are going from the tree line to the trunk?
>
> *A.* That is what I see, yes.
>
> * * *
>
> *Q.* And what do they appear to be doing?
>
> *A.* Taking items and picking them up off the ground in what would appear to be the tree line and it appears to me that they are putting them, looks like the person in the black is putting them in the back of the car. The back seat. But the trunk is still open.
>
> * * *
>
> *Q.* . . . [I]s this individual in the red shirt that Officer MacDonald identified as Joseph Gornto?
>
> *A.* Yes.
>
> *Q.* Does he appear to have an object [in] his hand?
>
> *A.* Yes.
>
> *Q.* What is it?
>
> *A.* Well, in his left hand it appears like a large water bottle and in his right hand it appears to be a cigarette.

First, contrary to Wardell's suggestion that narrative testimony is precluded, there is nothing in the Michigan rules of evidence prohibiting it. *People v Wilson*, 119 Mich App 606, 617; 326 NW2d 576 (1982); see also MRE 611(a) (allowing the court to exercise reasonable control over the mode of interrogating witnesses). Second, the facts of this case more closely resemble the permissible testimony in *Fomby* than the inadmissible testimony in *Perkins*. Like the testimony of the officer in *Fomby*, Jackson's testimony was rationally based on his familiarity with the video surveillance because he testified that he had observed the video many times. *Fomby*, 300 Mich App at 50-51. Further, the surveillance cameras were motion-activated

-3-

and the video cut in and out because the suspect vehicle was parked "right on the edge of where the sensor stops." Based on the choppiness of the footage, narration was helpful in providing to the jury a clearer understanding about what it was viewing. *Id*. at 51-52. Importantly, like *Fomby* and unlike *Perkins*, Jackson did not identify any of the suspects on the video as being Wardell; he only agreed that Gornto was the individual that another officer had identified. The testimony did not invade the province of the jury because the jury was able to reach its own conclusions as to whether Wardell was the other suspect seen in the video. *Perkins*, 314 Mich App at 160.

Next, Wardell argues that he should be granted a new trial because MacDonald "essentially identified" him as Gornto's "partner in crime." As part of the investigation, MacDonald obtained surveillance footage and created still photographs from it. MacDonald also testified that before his investigation he was familiar with Wardell and had met him on two prior occasions. The following exchange between the prosecutor and MacDonald transpired during his direct examination:

> *Q*. Now, going back to the video that you viewed, the two suspects near the gray Malibu, the individual in the black shirt, did he appear to match—or how would you compare his physical description to the defendant's?
>
> *A*. Exact to the physical description and appearance that I knew to be . . . Wardell . . . .
>
> *Q*. Okay. Going back to this particular exhibit, [a photograph extracted from the surveillance video], after you reviewed all the video or as you reviewed the video, did it appear that the subject in the black shirt whose appearance appeared to be the same as . . . Wardell . . . , did he ever come closer to the camera?
>
> *A*. No.
>
> *Q*. So this is the best picture we have?
>
> *A*. Yes.
>
> *Q*. And are you able to see his face in that photograph?
>
> *A*. No.
>
> *Q*. Is it fair to say that you're unable to make an identification of his face using the photograph or the video?
>
> *A*. Yes, correct.
>
> *Q*. Okay. But generally the appearance matches the physical size and shape as well as hair style?
>
> *A*. Yes.

Directly after this exchange, MacDonald also testified that he knew Wardell to be Gornto's uncle.

Like Jackson's testimony, MacDonald's testimony was properly admitted as lay opinion testimony pursuant to MRE 701. The testimony was rationally based on his perception because MacDonald watched the surveillance footage and isolated frames from it to create photographs, and it was on this basis that he provided his opinion regarding the appearance of the suspects. See *Fomby*, 300 Mich App at 50-51. Next, as in *Fomby*, based on the sporadic nature of the surveillance video, it can be inferred that his testimony helped the jury to better understand the relevance of the video evidence. *Id*. at 51-52. Above all, MacDonald's testimony did not invade the province of the jury because he did not identify the suspect in the black shirt as Wardell. See *id*. at 53. Although MacDonald did indicate that the unidentified suspect had the same physical characteristics as Wardell, he also unequivocally agreed that he could not identify the suspect wearing black. The video was not shown during MacDonald's testimony. When the video was played later, the jury had the opportunity to determine of its own accord whether Wardell was an "exact" match to the unknown suspect in the video. Accordingly, MacDonald's testimony constituted permissible lay opinion and Wardell is unable to show that its admission constituted plain error affecting his substantial rights. *Coy*, 258 Mich App at 12.

Wardell also argues that he was denied the effective assistance of counsel because his trial counsel failed to object to MacDonald's testimony. However, for the reasons stated above, MacDonald's testimony was permissible lay opinion that did not invade the province of the jury. *Fomby*, 300 Mich App at 53. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Moreover, in order to establish ineffective assistance of counsel, a defendant must show "that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). In this case, Wardell's DNA was found at the scene of the break-in; video surveillance footage from a nearby business showed Wardell's nephew and a suspect matching Wardell's description loading items into a vehicle owned by Wardell's mother; and several items stolen from the victims' home were found in Wardell's home and yard. In light of the overwhelming evidence of Wardell's guilt, he cannot establish prejudice resulting from counsel's alleged error. See *Vaughn*, 491 Mich at 669; *Perkins*, 314 Mich App at 162-163.

### III. ADMISSION OF UNFAIRLY PREJUDICIAL EVIDENCE

Wardell argues that a recording of a jail visit between himself and his mother was irrelevant and unfairly prejudicial and should have been excluded. We disagree.

We preliminarily note that this issue was waived for appellate review. When asked if he had any objection to the introduction of the recording, Wardell's trial counsel stated that he did not. Waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citations omitted). A defendant who affirmatively approves of an issue before the trial court may not later raise that issue on appeal. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 420; 884 NW2d

297 (2015). However, because Wardell raises a related ineffective assistance of counsel claim predicated on defense counsel's failure to object to admission of the recording, we will consider the merits of his argument for that purpose.

We discern no error from the admission of the jailhouse recording. All relevant evidence is admissible unless it is otherwise prohibited by the rules of evidence or other law. MRE 402. Irrelevant evidence is inadmissible. *Id*. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. However, evidence, even if relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403.

The content of the tape itself was not recorded by the court reporter, but Jackson described the content of the tape during his testimony:

> *Q*. And just to give the jury . . . a heads up, what should they be listening for?
>
> *A*. Mr. Wardell and his mom were having a conversation about the upcoming jury trial. And Mr. Wardell's opinion on how the trial is going to go.
>
> [Tape is played for jury.]
>
> *Q*. I don't know if the jury was able to hear that as clearly, but in the jail visit recording that I just played did you hear Carl Wardell indicate something about believing he would be found guilty at trial?
>
> *A*. Yes.

Wardell first argues that the recording was irrelevant. To be relevant, evidence must be both material and probative. *People v Mills*, 450 Mich 61, 67; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). Evidence is material if it is "related to any fact *that is of consequence* to the action." *Id*. (quotation marks and citation omitted). "[A]ll elements of a criminal offense are 'in issue' when a defendant enters a plea of not guilty." *Id*. at 69 (emphasis omitted). "However, materiality does not mean that the evidence must be directed at an element of a crime or an applicable defense." *Id*. at 67. Evidence is probative if it has *any* "tendency to make the existence of any fact that is of consequence" more or less probable. *Id*. at 68.

Wardell asserted that he was not a part of the crime and had no connection to it. However, he made statements to his mother that he believed he would be found guilty at trial. His guilt or innocence is clearly a fact of consequence. The probative value of the statement may not be overwhelming, but evidence need only have "any tendency" to make a fact more or less true to be probative. *Id*. Conflicting statements are relevant because they "tend to show a consciousness of guilt . . . ." *People v Unger*, 278 Mich App 210, 225-226; 749 NW2d 272 (2008) (quotation marks and citation omitted). Although we acknowledge that Wardell's statement could be viewed as expressing a lack of faith in the criminal justice system, his belief that he would be convicted can also be seen as conflicting with his assertions that he did not commit the crime, and does have at least *some* bearing on his guilt or innocence. As the trier of

fact, the jury was free to draw an inference about Wardell's guilt or innocence or his credibility from the recording, or free not to draw any inference at all. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

Wardell next argues that even if the evidence was marginally probative, it was unfairly prejudicial under MRE 403. Relevant evidence may be excluded if the danger of unfair prejudice from its introduction *substantially* outweighs its probative value. MRE 403. "In this context, prejudice means more than simply damage to the opponent's cause" because "[a] party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion." *People v Vasher*, 449 Mich 494, 501; 537 NW2d 168 (1995). "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury . . . ." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). Notably, "[MRE] 403 determinations are best left to a contemporaneous assessment of the presentation, credibility, and effect of the testimony by the trial judge." *Id*. (quotation marks and citation omitted). Wardell argues that the jury likely interpreted the recording as an admission of guilt, but fails to explain how this constitutes unfair prejudice. "It is for the trier of fact . . . to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Hardiman*, 466 Mich at 428.

Even if we were to conclude that the recording was improperly admitted, Wardell's cursory argument that counsel rendered ineffective assistance in this regard lacks merit because he cannot establish the second requirement for such a claim, i.e., that the result of the proceedings would have been different but for counsel's failure to object. *Vaughn*, 491 Mich at 669. The recording was short—only one minute—and was not the focus of the prosecution's case-in-chief. Therefore, any prejudicial effect was likely minimal. More importantly, it is unlikely that the short recording was outcome-determinative in light of the other evidence presented at trial. Wardell's DNA was found in the victims' home, their possessions were found in his bedroom, surveillance footage showed a man who closely resembled Wardell and his nephew was identified as the other suspect, and Wardell had wavering explanations for his whereabouts on the day of a crime. Accordingly, in light of the overwhelming evidence of Wardell's guilt, he simply cannot establish prejudice stemming from this alleged error.

## IV. JUDICIAL BIAS

Wardell contends that a question posed by the trial court pierced the veil of judicial impartiality. "[W]hether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). However, we review an unpreserved claim of judicial bias for plain error affecting Wardell's substantial rights. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011).

Due process guarantees that a criminal defendant receive a fair trial. Const 1963, art 1, § 17; US Const, Am XIV. "A trial judge's conduct deprives a party of a fair trial if [it] pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 170. The veil of judicial impartiality is pierced when, "considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171. In reviewing claims of judicial bias, the Court should conduct a "fact-specific analysis," "consider[ing] the cumulative effect" of any errors. *Id*. at 171-172. Our Supreme Court has explained:

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Id*. at 172.]

This list, however, is nonexhaustive, and this Court is free to consider any additional relevant factors. *Id*.

Wardell argues that a question posed by the trial judge at the close of his testimony demonstrated judicial bias that deprived him of a fair trial. Testifying on his own behalf, Wardell asserted that he was not involved in the break-in. When asked how a soda can with his DNA came to be at the scene, Wardell testified that he regularly left partially finished cans of Sprite around his home, where Gornto also resided, seemingly suggesting that Gornto may have placed the can at the scene. Perhaps in an effort to explain why Gornto's DNA was not on the can as well, Wardell further indicated that Gornto does not place his lips on soda cans when he drinks from them. At the conclusion of his testimony, the following exchange occurred:

> *The Court*: . . . I just have one question. May I see the picture of Mr. Gornto at the scene of this incident?
>
> * * *
>
> *The Court*: Showing you People's Exhibit 101. The water bottle that Mr. Gornto has in his hand—
>
> [*Wardell*]: Okay.
>
> *The Court*: Not a Sprite can.
>
> [*Wardell*]: Okay.
>
> *The Court*: Okay. Thank you. Does the jury have any questions? You may be excused.

In reviewing claims of judicial bias, the first factor we examine is the "nature or type" of the judicial conduct. *Id*. at 172. "Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice

to a particular side, [and] biased commentary in front of the jury . . . ." *Id*. at 172-173. "[I]t is appropriate for judges to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Id*. at 173. However, the question must conform to the Michigan Code of Judicial Conduct and avoid undue interference, impatience, and a severe attitude; additionally, "[i]t is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally." *Id*. at 174.

This factor does not weigh in favor of a conclusion that the trial court exhibited bias. The nature of the judicial conduct was a question, which is allowable, and it came at the appropriate time, at the end of Wardell's testimony, not as an interruption. Second, although it is inappropriate for a judge to exhibit disbelief of a witness, with the heavy presumption of judicial impartiality in mind, *Jackson*, 292 Mich at 598, a fair interpretation of the judge's question is that it was for clarification purposes, and it did not display an overly obvious incredulity. *Stevens*, 498 Mich at 174.

The second factor is the "tone and demeanor" of the trial judge. *Id*. Jurors "are very prone to follow the slightest indication of bias or prejudice upon the part of the trial judge" because of their reliance on the judge for guidance and instruction. *Id*. (quotation marks and citation omitted). To ensure that the judge exhibits impartiality, a judge should "be mindful of the substance of his or her words" and "the manner in which they are said." *Id*. at 175. Notably, "appellate courts typically do not have the benefit of viewing a trial judge's tone and demeanor first hand." *Id*. at 176. However, hostility, bias, or prejudice can sometimes be gleaned just from the nature of the words employed by the judge. *Id*.

With respect to this factor, an improper tone or demeanor is not readily detectable simply from the words used by the judge in the quoted exchange. It does not appear that the comments rose to the level of improperly expressing incredulity, bias, or hostility. *Id*. Furthermore, even if viewed as critical of Wardell's theory of the case, a critical or hostile comment alone does not support a finding of bias or partiality. *People v Willis*, 322 Mich App 579, 590; __ NW2d __ (2018).

The third factor is "the scope of judicial intervention within the context of the length and complexity of the trial . . . ." *Stevens*, 498 Mich at 176. Long trials or trials with complex issues may give rise to greater judicial intervention, while trials that are shorter and more straightforward generally do not. *Id*. When a witness's testimony is "convoluted, technical, scientific, or otherwise difficult for a jury to understand," judicial questioning is more likely to be appropriate to provide clarification for the jury. *Id*.

Here, the trial itself was relatively short—less than three days—and the questioning was also very brief. The trial court did not interrupt Wardell and the question came at the end of Wardell's cross-examination. Further, Wardell's explanation for how his DNA made its way into the victims' home can fairly be characterized as "convoluted," so a question clarifying a piece of evidence related to the theory was not uncalled for. Viewed in context, it is unlikely that such a brief comment pierced the veil of judicial impartiality. *Id*. at 172.

The fourth factor encompasses "the extent to which a judge's comments or questions were directed at one side more than the other." *Id*. at 176-177. This factor is viewed "in conjunction" with the third factor and refers to "imbalance[s] . . . with respect to either the frequency of the intervention or the manner of the conduct." *Id*. at 177. This factor does not support a finding of judicial partiality because the single inquiry cannot be reasonably characterized as excessively imbalanced against Wardell or in favor of the prosecution. *Id*. at 176-177.

Finally, the fifth factor relates to the "presence or absence of a curative instruction . . . ." *Id*. at 177. The model criminal jury instructions "emphasize that a judge's comments, rulings, and questions do not constitute evidence and that the jury should not attempt to discern the judge's personal opinion while considering the case." *Id*. The trial court can also give the jury further curative instructions during the course of the proceedings if any conduct could give rise to the appearance of bias. *Id*. "It is well established that jurors are presumed to follow their instructions," *Ericksen*, 288 Mich App at 197 (quotation marks and citation omitted), but "in some instances judicial conduct may so overstep its bounds that no instruction can erase the appearance of partiality," *Stevens*, 498 Mich at 177-178.

At both the beginning and the end of trial, the trial judge instructed the jury that his comments were not evidence, that judicial statements do not reflect personal opinion, and that the jury was tasked with determining Wardell's guilt based only on the evidence. Wardell fails to explain how an additional curative instruction would have made a difference, particularly when the challenged conduct was immediately followed by closing arguments and the court's final instructions and any appearance of bias was slight at worst. Therefore, this factor does not support the conclusion that the veil of judicial impartiality was pierced. *Id*. at 174.

Considering that none of the factors favors Wardell's position that the veil of judicial impartiality was pierced, Wardell has failed to demonstrate a reasonable likelihood that the trial judge's conduct during trial improperly influenced the jury by creating the appearance of advocacy or partiality against Wardell. *Id*. at 172. Accordingly, Wardell has failed to demonstrate plain error affecting his substantial rights. *Jackson*, 292 Mich App at 597.

## V. OFFENSE VARIABLE SCORING

Finally, Wardell contends that he is entitled to resentencing because the trial court erred when it assessed 10 points for offense variable (OV) 4 (psychological injury to victim), MCL 777.34.[1] However, Wardell's counsel waived this argument by explicitly and affirmatively agreeing with an assessment of 10 points for OV 4 at sentencing. See *Carter*, 462 Mich at 215; *Jackson (On Reconsideration)*, 313 Mich App at 420. This waiver extinguished any error arising

---

[1] We acknowledge that Wardell preserved this issue by filing a motion to remand on the basis of the alleged scoring error. See *People v Clark*, 315 Mich App 219, 223-224; 888 NW2d 309 (2016). The motion was denied for failure to persuade the Court of the necessity for remand. *People v Wardell*, unpublished order of the Court of Appeals, entered February 28, 2018 (Docket No. 339569).

from the scoring of OV 4.  Accordingly, we decline to address the merits of Wardell's argument concerning this issue.

Affirmed.


/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Anica Letica