*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 26, 2019

Plaintiff-Appellee,

v

No. 339921
Wayne Circuit Court
LC No. 16-007405-01-FC

LLAMAR MARQUISE VENSON,

Defendant-Appellant.

Before: JANSEN, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

A jury convicted defendant, Llamar Marquise Venson, of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(d)(*i*) (defendant was aided or abetted by another person and knew that the victim was physically helpless), and the trial court sentenced him to 15 to 30 years in prison for his conviction, with credit for 109 days served. On appeal, defendant raises challenges to his conviction as well as to his sentence. We affirm both.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from a sexual assault that occurred on July 4, 2004. The victim, 23-years old at the time, lived with her grandmother, who required her to be home by 11:00 p.m. After spending an evening with her boyfriend, Adrigo Cowans, the victim returned home late and found that her grandmother would not let her in the house. Cowans and the victim drove around until Cowans decided where they would go for the night. They pulled in front of a house and Cowans said that his cousin and his friend would be coming to the house. The victim went inside with Cowans and did not see anyone.

Cowans and the victim sat on the couch and watched television. After Cowans fell asleep, someone knocked on the door. The victim tried to wake Cowans, but was unable to do so. An elderly woman came out from one of the bedrooms and let in two men, who the victim believed were Cowans's cousin and his friend. According to the victim, one of the men asked the victim if she smoked marijuana. She said yes and asked if it was "already rolled." Both men said no. They asked if she wanted to smoke and she said yes. The victim went to the bathroom and, when she came out, the men were in a bedroom. She asked if they could smoke in the

living room near Cowans, but the men said no. After one of the men lit a marijuana blunt and both men smoked it, one of the men brought the blunt to the victim, who was standing in the doorway to the bedroom. After inhaling the marijuana, the victim became light-headed; after inhaling a second time, her legs and feet started to become weak and she started to lose her balance. The man who handed her the blunt caught her and brought her to the couch in the bedroom.

The victim testified that the men kept asking her if she was okay, but her tongue was getting numb and she could not speak or move. One of the men shut the door to the bedroom. They started asking each other about a condom, which neither of them had, and then debated who would go first. One of the men tried to take the victim's dress off from the top, but was unable to do so. The men then lifted up her dress and laid her down, still arguing about who would go first. One of the men pulled her dress up and the other man pulled down her underwear. One of the men then put his penis in her vagina. The victim testified that she was crying. The other man was rubbing the victim's breast area. When the first man stopped, the other man put his penis in the victim's vagina. After the second man finished, the men started to leave, but then one of them turned around and fixed the victim's clothing. The men carried the victim out to the living room and sat her in a chair. She was still unable to communicate, stand, or walk. The men then left out the front door.

Cowans testified that when he woke up, the victim was sitting in a chair in the corner crying. The victim said that she wanted to get out of the house, and Cowans helped her to the car. Cowans asked the victim why she was crying and she said, "[Y]our cousin and his friend raped me." After going back inside and confronting defendant and Williams, who denied the sexual assault, Cowan took the victim to the hospital.

Dr. Chada Reddy testified that she worked at Holy Cross Hospital in Detroit in July 2004 as an emergency room doctor and, based on a review of his chart, confirmed that he saw the victim on July 4, 2004. He further testified that a rape kit was completed, and there would also have been emergency room records, which he did not have; someone had informed him that the records had been destroyed. Reddy testified regarding the information contained in the three pages from the rape kit. Reddy did not know if there were more than three pages to the rape kit, and he did not recall a need to order a toxicology report for the victim.

Ulysha Hall, Deputy Chief of Police for the Detroit Police Department, was on patrol on July 4, 2004. Dispatch sent her and her partner to Holy Cross Hospital, where she spoke with the victim and produced a report. The victim identified her perpetrators as black males and provided their nicknames, which were "T" and "Thug," who also was called "Animal Thug." Hall notified the Sex Crimes Unit about the alleged assault.

The victim's rape kit was one of approximately 11,000 rape kits discovered in storage by the Detroit Police Department in 2009. Kathy Fox, a forensic scientist with the Michigan State Police in the Lansing Crime Lab, testified that a crime lab in Virginia analyzed the rape kit in

2010.[1] Fox explained that analysis revealed spermatozoa on the victim's vaginal swabs and semen on the victim's dress, and that both the vaginal swabs and the dress were submitted for DNA analysis. The DNA profile from the sperm fraction of the vaginal swabs was consistent with the mixture of two foreign individuals, including a major male contributor (male one) and a minor donor. The DNA profile obtained from the sperm fraction of the dress was consistent with a male contributor (male two). In 2011, a search of the "Michigan State Police DNA Index System Database"[2] associated the sperm fraction on the dress with Cowans,[3] and the sperm fraction on the vaginal swabs with defendant.

Detective Janet Sise, assigned to the Wayne County Prosecutor's Sexual Assault Kit Task Force, became the officer-in-charge of the victim's case in 2014. In 2016, defendant and his codefendant, Tyrod Lerenzo Williams, were charged with CSC-I under MCL 750.520b(1)(d)(*i*) (defendant was aided or abetted by another person and knew that the victim was physically helpless) and third-degree criminal sexual conduct (CSC-III) under MCL 750.520d(1)(c) (victim physically helpless). They were tried jointly before one jury in 2017. The jury acquitted Williams, but convicted defendant of CSC-I, and, as already indicated, the trial court sentenced him to 15 to 30 years' imprisonment.

## II. ANALYSIS

### A. SCORING OF OFFENSE VARIABLES

On appeal, defendant raises two challenges to his sentence. Defendant first contends that the trial court erred in scoring offense variable (OV) 4 at 10 points because there was no evidence that the victim suffered serious psychological injury. He also contends that the trial court erred in scoring OV 8 at 15 points because there was no evidence that he removed the victim to another place of greater danger or held her captive beyond the time necessary to commit the charged crime. We disagree. We review for clear error the circuit court's factual determinations, which must be supported by a preponderance of the evidence. *People v Smith*, 318 Mich App 281, 284-285; 897 NW2d 743 (2016). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017).

OV 4 addresses "psychological injury to a victim." MCL 777.34(1). The trial court must assign 10 points for OV 4 if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a); MCL 777.34(2). "In making this determination, the fact that treatment has not been sought is not conclusive." MCL 777.34(2). "[A] trial court may not simply assume that someone in the victim's position would have suffered psychological

---

[1] Fox explained that when the Detroit Police discovered the rape kits, they looked for other crime labs around the country to help process them in a timely manner.

[2] The witness likely was referring to CODIS, the Combined DNA Index System.

[3] Both the victim and Cowans testified that they had had sex in a park on their evening out.

harm because MCL 777.34 requires that serious psychological injury *occurred* to a victim, not that a *reasonable* person in that situation would have suffered a serious psychological injury." *People v White*, 501 Mich 160, 163; 905 NW2d 228 (2017) (quotation marks and citation omitted).

In the present case, the victim testified that, because of the sexual assault, she went to therapy. The victim's impact statement, contained in defendant's presentence investigation report (PSIR), further indicates that the offense caused the victim to have "trust issues" and "a difficult time maintaining relationship [sic] with men." The victim stated that she "has been in therapy and states she was psychologically traumatized as a result." Defendant argues that there was no documentary evidence to support the victim's claims that she received counseling, but such evidence is not required because it is not even necessary that a victim actually seek treatment. The victim's testimony and statements indicating that she went to therapy and was psychologically traumatized were sufficient to establish by a preponderance of the evidence that the victim suffered serious psychological injury requiring professional treatment. See also *People v Williams*, 298 Mich App 121, 124; 825 NW2d 671 (2012) (noting that a victim's expression of fearfulness and anger can constitute sufficient evidence of psychological injury). Thus, the trial court did not err by scoring OV 4 at 10 points.

OV 8 addresses "victim asportation or captivity." MCL 777.38(1). A trial court must assign 15 points to OV 8 if "[a] victim was asported [i.e., carried away] to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." MCL 777.38(1)(a). "[M]ovement of a victim that is incidental to the commission of a crime nonetheless qualifies as asportation under OV 8." *People v Barrera*, 500 Mich 14, 22; 892 NW2d 789 (2017).

The victim testified that she smoked marijuana in the doorway of the bedroom and, when she felt weak and started to lose her balance, one of the defendants carried her to the couch in the bedroom and shut the door. The closed bedroom, in which the victim was isolated from Cowans, was a place or situation of greater danger to the victim because it reduced the likelihood that Cowans would notice or discover the assault. Thus, the trial court did not clearly err by finding that there was sufficient movement to a place of greater danger or a situation of greater danger, and the trial court did not err by scoring OV 8 at 15 points.

## B. DUE PROCESS VIOLATIONS

Defendant raises the remaining issues addressed in this opinion in a standard 4 brief.[4] Defendant alleges two violations of his right to due process. He contends that his due process rights were violated by the police's failure to obtain the victim's medical records before they were destroyed, and by the six-year delay in bringing his case to trial. We review defendant's claim that he was denied due process de novo, and a trial court's findings of fact for clear error. See *People v Vaughn*, 491 Mich 642, 650; 821 NW2d 288 (2012). Generally, "[w]hether

---

[4] A "Standard 4" brief refers to a brief filed on behalf of an indigent criminal defendant pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4.

defendant was denied his right to a speedy trial is an issue of constitutional law," which is also reviewed de novo. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). However, because defendant's speedy trial claim is unpreserved, our review is for plain error affecting defendant's substantial rights. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Turning first to defendant's claim that the police violated his right to due process by failing to obtain the victim's medical records before they were destroyed, "[d]efendant bears the burden of proving that any missing evidence was exculpatory or, in the case of failure to preserve evidence, that the police acted in bad faith." *People v Bosca*, 310 Mich App 1, 26; 871 NW2d 307 (2015). "Even when 'potentially useful' evidence is destroyed and the destruction would constitute a violation of due process, the evidence must have been destroyed in bad faith." *Id*. at 27.

To the extent that defendant alleges the prosecutor intentionally suppressed exculpatory evidence in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), to prevail, he must show that the evidence was exculpatory, the evidence was suppressed by the state, and prejudice ensued. *Bosca*, 310 Mich App at 27-28. Defendant has not met this burden because he has not established that the medical records at issue were exculpatory. He merely alleges that they were *potentially* exculpatory. Even if the medical records contained a toxicology report there is no indication what such report would have shown. Moreover, there is no claim that the medical records were in the prosecution's possession and the prosecution is not required to secure discoverable information on behalf of defendant. *Id*. at 29 (stating that where there was no evidence that the prosecution ever obtained the medical records, there was no necessity to provide them to the defendant). Thus, defendant has not established a *Brady* violation.

To the extent that defendant argues that the police failed to preserve potentially useful evidence, *id*. at 26, defendant fails to establish that the police acted in bad faith with regard to obtaining the records before they were destroyed. Detective Sise's testimony indicates that, by the time she was assigned the case in 2014, had obtained the victim's release for the records, and had attempted to obtain the records, it was past the hospital's 11-year retention period and the records no longer existed. The prosecution argued that, although there was a CODIS match to defendant in 2011, because the police prioritized investigating serial offenders before investigating single offenders, they did not reach the subject case until 2016. Given these circumstances, the trial court found that the prosecution did not intentionally delay, thus effectively finding that the prosecution did not act in bad faith. These findings are not clearly erroneous. Thus, because defendant fails to show that the police acted in bad faith, he fails to establish that the failure to preserve the possibly exculpatory evidence violated his right to due process.

Turning to defendant's contention of a due-process violation arising from delay in bringing him to trial, the record does not support a speedy trial violation or substantial prejudice from any prearrest delay. Defendant asserts that there was an unreasonable delay between the time a CODIS match was obtained in 2011 and when his trial began in 2017. The majority of the six-year delay that defendant relies upon preceded his arrest. Defendant was arrested on August 7, 2016, and his trial began on April 17, 2017. If the time between a defendant's arrest and the

start of trial is less than 18 months, the defendant has the burden to show that he or she suffered prejudice. *People v Waclawski*, 286 Mich App 634, 665; 780 NW2d 321 (2009). The delay between defendant's arrest and the start of his trial was only eight months. Therefore, to establish a due-process violation arising from this delay, defendant would have to show prejudice based on acts that occurred during the same eight months. See *id*.

In addition, in order to prevail on his claim of a due-process violation arising from prearrest delay, defendant must show that actual and substantial prejudice resulted from the delay. *People v Patton*, 285 Mich App 229, 237; 775 NW2d 610 (2009).

> Before dismissal may be granted because of prearrest delay there must be actual and substantial prejudice to the defendant's right to a fair trial and an intent by the prosecution to gain a tactical advantage. Substantial prejudice is that which meaningfully impairs the defendant's ability to defend against the charge in such a manner that the outcome of the proceedings was likely affected. [A]ctual and substantial prejudice requires more than generalized allegations. If a defendant demonstrates prejudice, the prosecution must then persuade the court that the reason for the delay sufficiently justified whatever prejudice resulted. [*Id*.]

"Defendant must present evidence of actual and substantial prejudice, not mere speculation. A defendant cannot merely speculate generally that any delay resulted in lost memories, witnesses, and evidence, even if the delay was an especially long one." *People v Woolfolk*, 304 Mich App 450, 454; 848 NW2d 169 (2014) (citations omitted).

As indicated above, the trial court did not err in finding that there was no intentional delay by the prosecution. Nothing in the record suggests that the delay from defendant's CODIS match in 2011 until his arrest in 2016, occasioned primarily by law enforcement's reasonable decision to prioritize investigation of serial sex offenders over the investigation of single offenders, was intended by the prosecution to gain a tactical advantage. In order to prove a due-process violation arising from prearrest delay, defendant has to prove actual and substantial prejudice *and* intentional delay to obtain a tactical advantage. Because he has not proved the latter, we need not address the former.[5] Defendant has not established a due-process violation.

---

[5] Even if we were to consider the matter, defendant has not established that the prearrest delay resulted in actual and substantial prejudice. Defendant alleges that the delay resulted in the destruction of potentially useful medical records and the death of "Pat," the elderly woman who let defendant and Williams in the house on the night of the sexual assault. It is not clear that the medical records would be exculpatory, but even if they did not confirm the victim's claim that she was drugged, the victim's testimony was nonetheless sufficient to establish the elements of CSC-I. With regard to Pat, it was not clear that she had died or whether her testimony would have benefitted defendant. Cowans testified at trial that he "heard she was deceased," and while she allegedly let defendant and Williams into the house that night, there is no indication that she was an eyewitness to the sexual assault, given the victim's testimony that the bedroom door was

## C. ADMISSION OF EVIDENCE

Defendant next contends that the trial court erred by admitting incomplete medical records as evidence at trial. Specifically, defendant argues that the rape kit documents were more prejudicial than probative because the accompanying medical records were missing. We disagree. Because defendant did not argue in the trial court, as he does on appeal, that the admission of the documents from the rape kit, without the accompanying medical records, was improper under MRE 403 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time), this issue is unpreserved. See *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011) ("an objection on one ground is insufficient to preserve an appellate argument based on a different ground."). We review unpreserved claims of error for plain error affecting defendant's substantial rights. *People v Shaw*, 315 Mich App 668, 682; 892 NW2d 15 (2016).

Defendant does not dispute that the rape kit documents were relevant. "All relevant evidence is prejudicial to some extent. Exclusion is required under MRE 403 only when the danger of unfair prejudice substantially outweighs the probative value of the evidence." *People v Head*, 323 Mich App 526, 541; 917 NW2d 752 (2018). "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

The prejudice alleged by defendant is that the trial court admitted the rape kit documents without the accompanying medical records, which would have included a toxicology report showing any drugs in the victim's system. The victim's testimony at trial indicated that she may have been drugged. Nonetheless, it is unknown what any toxicology report would have shown. The trial court found that the toxicology report would have been relevant, but that it was not clear who was prejudiced. Thus, defendant fails to establish any unfair prejudice from the admission of the rape kit documents without the accompanying medical records. Moreover, in closing, trial counsel argued that medical records were missing and that those records likely would have shown what was in the victim's system that night. Given that the jury was aware of the missing medical records, it is unlikely that it gave undue weight to the rape kit documents. Nor was it inequitable to allow the use of the rape kit documents in this case. Therefore, defendant fails to establish plain error in the admission of the rape kit documents.

---

closed. Pat's testimony could have confirmed or refuted that defendant was present that night; however, there was no real dispute that defendant was present and had sexual intercourse with the victim, given the DNA evidence. Accordingly, there is nothing to suggest that Pat's testimony would have been critical to the defense. Finally, if defendant demonstrated prejudice, we would then have to consider whether the prosecution established that the reason for the delay sufficiently justified whatever prejudice resulted, see *Patton*, 285 Mich App at 237, and, as already indicated, there is no evidence of deliberate misconduct by the police or prosecution.

## D. SUFFICIENCY OF THE EVIDENCE

Defendant also contends that there was insufficient evidence to support his conviction of CSC-I under MCL 750.520b(1)(d) because an essential element of this offense is that the actor be aided or abetted by another person and the jury found defendant's alleged accomplice, Williams, not guilty of the charged offense. Once again, we disagree. This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Willis*, 322 Mich App 579, 583; 914 NW2d 384 (2018). In determining whether sufficient evidence to support a conviction was presented at trial, "this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *Id*. Further, "a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury's verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "Whether conduct falls within the scope of a criminal statute . . . is a question of statutory interpretation that [this Court] review[s] de novo." *Willis*, 322 Mich App at 584.

Defendant was charged and convicted under MCL 750.520b(1)(d)(*i*), which provides:

> (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> * * *
>
> (d) The actor is aided or abetted by 1 or more other persons and either of the following circumstances exists:
>
> (*i*) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

"The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Henderson*, 306 Mich App 1, 10; 854 NW2d 234 (2014) (quotation marks and some citations omitted). In order to establish that a person aided or abetted the commission of a crime, prosecution must show

> that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*Id*. (quotation marks and citation omitted).]

Defendant contends that there was insufficient evidence to support his conviction because an accomplice is a necessary element of the offense and the jury acquitted his alleged accomplice, Williams, of all charges. Defendant is incorrect. The plain language of the relevant statute does not include any express requirement that the person who aided or abetted the

-8-

defendant be convicted of any offense. See MCL 750.520b(1)(d). Rather, the statute merely requires that the other person "aided or abetted" the defendant, which means that the other person performed acts or gave encouragement that assisted the commission of the crime and intended the commission of the crime or had knowledge that the principal intended its commission at the time that the person gave aid or encouragement. *Henderson*, 306 Mich App at 10.[6]

Despite his acquittal, there was sufficient evidence for the jury to find beyond a reasonable doubt that Williams performed acts or gave encouragement that assisted defendant's commission of CSC-I and that Williams intended the commission of CSC-I, or had knowledge that defendant intended its commission, at the time that Williams gave aid or encouragement. The record shows that both men participated in offering the marijuana to the victim, both repeatedly asked if she were okay, they discussed together whether either had a condom, and they debated who would "go first." The victim testified that one of the men lifted her dress up and the other man pulled down her underwear. The victim's testimony clearly established that Williams performed acts that assisted in the commission of the crime. Williams's intent that CSC-I be committed, or knowledge that defendant intended to commit CSC-I, can be inferred from his actions in assisting in removing the victim's clothing, which occurred after the two men discussed a condom and argued about who would "go first." On this record, there was sufficient evidence that Williams aided or abetted defendant. Defendant does not dispute the elements of sexual penetration and that the victim was physically helpless. Therefore, there was sufficient evidence to support defendant's conviction of CSC-I under MCL 750.520b(1)(d)(*i*).

## E. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that trial counsel was ineffective for failing to move for a directed verdict of acquittal after the jury acquitted Williams of all charges. We disagree. Because defendant failed to preserve his claim of ineffective assistance of counsel by moving for a new trial or an evidentiary hearing in the trial court, our review "is limited to mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

A criminal defendant has the fundamental right to effective assistance of counsel. However, it is the defendant's burden to prove that counsel did not provide effective assistance. To prove that defense counsel was not effective, the defendant must show that (1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant.

---

[6] This Court has held that in order to support a defendant's conviction under MCL 750.520b(1)(d)(*ii*) under an aiding or abetting theory, it was not necessary to "show that a specifically named individual was the guilty principal, but only that some individual was a guilty principal." *People v Vaughn*, 186 Mich App 376, 382; 465 NW2d 365 (1990). That a principal need not be convicted in order to convict an aider and abettor under MCL 750.520b(1)(d) lends support to the conclusion that an aider and abettor need not be convicted in order to convict a principal under the statute.

The defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different. [*Id*. at 80-81.]

As discussed above, defendant's conviction of CSC-I under MCL 750.520b(1)(d)(*i*) did not require Williams to be convicted of having committed either charged offense. It merely required the jury to find beyond a reasonable doubt that Williams aided or abetted defendant. Accordingly, trial counsel's failure to move for a directed verdict of acquittal after the jury acquitted Williams did not fall below an objective standard of reasonableness nor affect the outcome of the trial. *People v Horn*, 279 Mich App 31, 39-40; 755 NW2d 212 (2008) (noting that counsel is not ineffective for failing to make a futile motion). Therefore, defendant was not denied the effective assistance of counsel.

Affirmed.

/s/ Kathleen Jansen
/s/ Jane M. Beckering
/s/ Colleen A. O'Brien

-10-