CORRIGAN, J.
At issue in this case is whether defendant is entitled to a new trial on the basis of his argument that two unavailable witnesses’ written recantations were improperly excluded from defendant’s second trial. A transcript of the witnesses’ testimony from the first trial was admitted as evidence at the second trial and defendant sought to admit the recanting statements for purposes of impeachment. The Van Burén Circuit Court denied defendant’s motion to introduce the statements. The court also denied defendant’s motion for a new trial, in which defendant argued that the statements were improperly excluded. The Court of Appeals reversed and ordered a new trial. We conclude that defendant is not entitled to a new trial because the trial court acted within its discretion when it excluded the recantations and denied defendant’s motion for a new trial. Further, any error that may have occurred was harmless. Accordingly, we reverse the Court of Appeals judgment and remand to that court for consideration of any remaining issues advanced by defendant in his claim of appeal.
FACTS AND PROCEEDINGS IN THE CIRCUIT COURT
In 2001 and 2002, juries twice convicted defendant, Junior Fred Blackston, for the first-degree murder of Charles Miller.[1] In 1988, Miller was executed and buried in a field near defendant’s home in Allegan County. Miller’s disappearance remained unsolved until codefendant Charles Lamp ultimately led the police to Miller’s body in 2000. At defendant’s first trial, code *455 fendants Lamp and Guy Simpson testified against him. The prosecutor permitted Lamp to plead guilty of manslaughter, while Simpson received complete immunity for his testimony. Both codefendants testified that defendant, Lamp, and Simpson took Miller to the field where defendant shot Miller and cut off his ear to show it to a local drug dealer, Benny Williams, as proof that Miller was dead. Lamp testified that he helped defendant plan and execute the murder after defendant learned that Miller planned to rob Williams.
Defendant testified at the first trial but not at the second. Defendant agrees that the victim was at defendant’s house on the night he was murdered. Through alibi witnesses, defendant asserted that he did not leave the house with Miller, Lamp, and Simpson. The defense contended that defendant remained home with his lVz-year-old daughter. The child’s mother — defendant’s girlfriend at the time, Darlene (Rhodes) Zantello — was pregnant. All parties agreed that she left her lV2-yearold daughter with defendant when Zantello went to the hospital that night because she was experiencing pain. Lamp and Simpson testified that defendant brought his daughter along and left her sleeping in the back seat of the car during the crime.
Zantello testified at the first trial that, when she returned home from the hospital that night, defendant was not present but returned later with Simpson. Zantello overheard Simpson say “that was like a movie with all that blood.” She also recalled hearing the men mention an ear being cut off, a pre-dug hole or grave, and that defendant “almost blew his whole head off.”
Rebecca (Krause) Mock, Miller’s girlfriend at the time of his death, and Mock’s sister, ■ Roxann (Krause) Barr, also testified that, in 1990, defendant had admitted his involvement in the murder to them. They said *456 that defendant cried, confessed his participation, and stated that he felt badly about their acts. The police confirmed that shortly after defendant confessed Mock and Barr reported defendant’s confession to them.
Defendant’s three sisters each confirmed his alibi. Each sister attested that she had visited defendant’s house — and had found him home with his daughter — on the night of September 12, 1988, when Miller disappeared. Defendant also produced Williams, who claimed to have known nothing about Miller’s death. The investigators acknowledged that they had been unable to link Williams to Miller’s murder.
The second jury trial took place in 2002. In the interim, both Simpson and Zantello proffered written statements[2] recanting their former testimony. Simpson claimed that only he and Lamp participated in the murder and that he had implicated defendant for personal advantage under pressure from the prosecutor. Zantello claimed that an abusive boyfriend had pressured her; he sought to gain favor with the prosecutor in a separate case against him. In her recanting statement, she denied having overheard Simpson and defendant talking about the murder and claimed that defendant was home when she returned from the hospital.
Neither Simpson nor Zantello testified at the retrial. Simpson refused to testify. Zantello stated that she could not remember the night of the crime, her previous statements to the police, her previous testimony, or the contents of her recanting affidavit, which she had completed only three months earlier. The trial court declared both witnesses unavailable. It admitted their testimony from the first trial under MRE 804(b)(1), *457 which establishes a hearsay exception for former testimony of an unavailable witness. Without citing any authority, defense counsel moved to admit the written recantations to impeach the unavailable witnesses. The court ruled the recantations inadmissible under MRE 613, which addresses prior statements of present witnesses, because the inconsistent statements in the recantations were not asserted before the former testimony. The court also ruled that Simpson and Zantello were attempting to manipulate the trial process by conveniently becoming unavailable to testify. Further, it ruled that because the recanting statements could not be cross-examined the prosecutor would be prejudiced by their contradictory claims regarding defendant’s innocence.
Defendant was convicted again of first-degree murder and again moved for a new trial. For the first time, he argued that the recanting statements should have been admitted under MRE 806, which permits impeachment of hearsay declarants.[3] The court agreed that the statements could have been admitted under MRE 806, but opined that it would have excluded them under MRE 403 — because their undue prejudice outweighed their probative value — even if defendant had raised his *458 argument under MRE 806 at trial. The court opined that the statements were highly suspect. Not only did they contain collateral and damaging allegations that could not be challenged on cross-examination, but the witnesses had conveniently rendered themselves unavailable to testify just seven and three months, respectively, after they completed their recantations. Therefore, defendant’s new argument for admission under MRE 806 did not justify a new trial.
APPEAL
Defendant appealed and the Court of Appeals reversed and remanded for a new trial, concluding that the statements should have been admitted under MRE 806. The Court held that any prejudice could have been remedied by redacting portions of the statements and instructing the jury to consider them only for their impeachment value.[4] Applying the harmless error standard of review for nonconstitutional error, it concluded that the error required reversal because, more likely than not, it had been outcome determinative.[5]
This Court vacated the Court of Appeals opinion and remanded for that court to “fully evaluate the harmless error question by considering the volume of untainted evidence in support of the jury verdict, not just whether the declarants were effectively impeached with other inconsistent statements at the first trial.” We also directed the Court of Appeals to consider whether the error, if any, was harmless beyond a reasonable doubt.[6] *459 On remand, the Court of Appeals repeated its conclusion that the statements should have been admitted and, therefore, that the trial court abused its discretion when it denied defendant’s new trial motion. The Court of Appeals also concluded that the error was not harmless beyond a reasonable doubt and again ordered a new trial.[7] The prosecution applied for leave to appeal to this Court and we ordered oral argument to consider whether to grant leave or take other action.[8] We now reverse.
STANDARD OP REVIEW
The correct standard of appellate review of defendant’s claimed evidentiary error has generated considerable debate in this case. The prosecution originally conceded that any error was preserved constitutional error — because it implicated defendant’s confrontation rights — and therefore subject to review for whether it was harmless beyond a reasonable doubt.[9] But the Court of Appeals found it unnecessary to decide whether the error was constitutional in nature. It held that reversal was required even under the less stringent standard for nonconstitutional error, concluding that it was more probable than not that the error was outcome determinative.[10] Our order of remand presumed that the standard governing preserved constitutional error applied.[11] The prosecution now argues that any eviden *460 tiary error is subject to plain error review because defendant did not sufficiently preserve the claim of error at trial.[12] Because we conclude that the error, if any, was harmless under any of these standards, and because the Court of Appeals did not explicitly analyze which standard of review was appropriate, we find it unnecessary to resolve this question.
A trial court’s decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion.[13] A trial court may be said to have abused its discretion only when its decision falls outside the principled range of outcomes.[14]
ANALYSIS
First, we conclude that the trial court acted within its discretion in denying defendant’s motion for a new trial. At trial, defendant moved that he be “allowed somehow” to introduce the unavailable witnesses’ statements as impeachment evidence.[15] At the new-trial hearing, he argued that MRE 806 required admission of the statements. The trial court concluded that evidence impeaching hearsay declarants that qualifies for admission under MRE 806 is not automatically admissible. *461 Rather, other jurisdictions have held with regard to the rule’s counterparts, FRE 806 and similar state provisions, that such evidence is still subject to the balancing test under MRE 403 or its equivalent. The trial court’s conclusion is supported by the plain language of MRE 806, which provides that the credibility of the declarant “may be attacked, and if attacked may be supported ....” (Emphasis added.) There is nothing in the rule of evidence that requires admission of an inconsistent statement, and MRE 806 provides no greater leeway regarding admissibility of a statement for impeachment purposes than is granted to litigants offering impeachment evidence in general.[16] This Court expressly permits employing a balancing analysis under MRE 403 when considering the admissibility of other forms of impeachment evidence. See People v Brownridge, 459 Mich 456, 461; 591 NW2d 26 (1999). Thus, it is within the trial court’s discretion to exclude the evidence “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” MRE 403.[17]
*462 “Rule 403 determinations are best left to a contemporaneous assessment of the presentation, credibility, and effect of testimony” by the trial judge. People v VanderVliet, 444 Mich 52, 81; 508 NW2d 114 (1993). Assessing probative value against prejudicial effect requires a balancing of several factors, including the time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. People v Oliphant, 399 Mich 472, 490; 250 NW2d 443 (1976). Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence. People v Mills, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). As we have previously noted, a party may strike “ ‘as hard as he can above, but not below, the belt.’ ” People v Vasher, 449 Mich 494, 501; 537 NW2d 168 (1995), quoting McCormick, Evidence (2d ed), § 185, p 439.
In this case, the court ruled that the recantations would have qualified for admission under MRE 806, but concluded that their prejudicial nature outweighed their probative value under MRE 403. The court reasoned that their probative value was limited because both Zantello and Simpson had been effectively impeached during cross-examination at the first trial. Zantello’s testimony at the first trial revealed that she had initially told the police that defendant was home on the night of the murder and only later asserted his absence. Further, Simpson had regularly changed his stoiy; his statements varied regarding defendant’s involvement in the crime.
*463 The court also concluded that the recantations were highly prejudicial; Zantello and Simpson did not merely recant their former accusations, but provided lengthy explanations for why they had lied. Simpson’s statement in particular amounted to an epistle advocating defendant’s acquittal. The court opined that Simpson’s statement likely would not have been admissible even if he had testified. At a minimum, Simpson would have been vigorously cross-examined regarding the statement had he testified. Yet, because he rendered himself unavailable at the second trial, he foreclosed the possibility of cross-examination regarding his wide-ranging assertions.[18]
We conclude that the court’s decision was principled and supported by Michigan law. The trial court reasonably excluded the statements because they were highly unfairly prejudicial. Most significantly, to the extent that the statements’ irrelevant or unfairly prejudicial content could have been redacted as suggested by the Court of Appeals, their remaining contents would have been largely cumulative.
Simpson’s recantation, which is unsworn,[19] is an eight-page missive, more than half of which is devoted to recounting hearsay statements purportedly made by *464 various attorneys associated with the case. For example, Simpson asserts that the prosecutor regularly advised Simpson that he “does not believe in ‘God,’ ” and that defendant’s own attorney encouraged Simpson to testify against defendant because Simpson would be “crazy” not to accept the prosecutor’s offer of immunity. The general tenor of the recantation is that the prosecutor essentially admitted to Simpson that he intended to convict defendant without regard to whether defendant was innocent. Simpson claims that the prosecutor forced Simpson to commit perjury at the first trial in order to achieve his goal. These unsworn statements would inject the specter of prosecutorial corruption into the trial in a manner that the prosecutor could not directly challenge given that Simpson refused to take the stand; the allegations injected issues into the triad that went far beyond Simpson’s credibility. Therefore, their potential for misleading or confusing the jury— and, thus, their potential for unfair prejudice — was great.
With respect to Zantello’s recanting statement, she claims to have previously perjured herself as a result of cajoling statements by a former boyfriend, who never testified and was never cross-examined about his involvement. Although Zantello testified briefly at the second trial, she was unable to answer the prosecutor’s questions because she did not “recall what [she] said” and did not want to “incriminate [her]self because of [her] former testimony” inculpating defendant. Both witnesses were thus unwilling or unable to testify regarding the contents of the statements that they signed just seven and three months, respectively, before the retrial.
For these reasons, the trial court reasonably concluded that the statements’ potential for prejudice was *465 great. They largely contained unduly prejudicial hearsay and accusations regarding collateral issues with the potential to mislead the jury. As the Court of Appeals correctly observed, the statements could have been redacted to the extent that their contents were inadmissible or unduly prejudicial. But the remaining information was still properly excluded because it was largely cumulative when used for its only admissible purpose: impeachment.[20] Because Simpson and Zantello were impeached with information substantially similar to the information contained in the statements, we cannot agree with the dissent that exclusion of the statements “resulted in the jury being painted a false picture.” Post at 488.
Specifically, Simpson’s statement admits that he made inconsistent statements to police beginning in 1989 “when doing so served [his] best interests], (ie: getting-deals [sic] on other non-related offenses).” He states that he lied at the first trial to avoid perjury charges and gain immunity from prosecution. He also reiterates that Lamp had threatened to kill him or his family if he implicated Lamp. He proceeds to give an account of events on the night of the murder in which he asserts that Lamp, not defendant, killed Miller. Simpson’s cross-examination during the first trial, which was read at the second trial, had similarly revealed that Simpson told varying stories over the years regarding who was responsible for the murder in order to gain personal advantage. His testimony also revealed that he had been threatened by Lamp. Simpson also explicitly acknowledged during the first trial that, if he did not accuse defendant of the murder at *466 trial as he agreed to do in exchange for full immunity, Simpson would face various charges, including perjury. The second jury was fully informed of Simpson’s immunity deal.
Zantello’s statement similarly repeats assertions that she made at the first trial and that were read into the record at the second trial. At the first trial and in her recanting statement, Zantello confirmed that she originally told the police that she knew nothing about the murder and did not overhear defendant and Simpson talk about any murder. Indeed, as with Simpson, the primary permissible use of Zantello’s recantation would have been to show the jury that she had reverted to a previous version of her story, not that she was claiming defendant’s innocence for the first time. Accordingly, it is significant that defense counsel succeeded in confronting Zantello with the fact that she had recanted by explicitly asking her at the second trial whether she remembered making a statement that defendant “was home when [she] got home and that [she] had lied under oath originally because [she] had been threatened.” She simply answered: “No, I do not.”
Under these circumstances, the admissible portions of both statements were largely cumulative to the remaining evidence relevant to Simpson’s and Zantello’s credibility, which was presented at both trials and, with regard to Zantello, which was expanded on during her live testimony at the second trial. Therefore, the trial judge — who had become familiar with the witnesses over the course of two trials — did not abuse his discretion when he denied defendant’s motion for a new trial on the basis of defendant’s argument that admission was required under MRE 806. At a minimum, the trial court was called upon to make a close, discretionary decision regarding whether the danger of undue *467 prejudice that the statements presented outweighed their probative nature. Moreover, the court was required to consider defendant’s claim for admission on the basis of an argument that defendant did not advance until after trial and, therefore, which the court was unable to evaluate contemporaneously at the time of the objection. Indeed, at trial, defendant not only failed to cite a single court rule, but he moved to admit each statement in its entirety; he did not argue for admission under MRE 806 of redacted versions of the statements to avoid unfair prejudice to the prosecution. Under these circumstances, we disagree with the dissent’s contention that exclusion of the statements amounted to error, let alone plain error. “[T]he trial court’s decision on a close evidentiary question . . . ordinarily cannot be an abuse of discretion.” People v Sabin (After Remand), 463 Mich 43, 67; 614 NW2d 888 (2000). Here, where the court was faced with the witnesses’ unfairly prejudicial and largely cumulative inconsistent statements, we cannot say that the court’s decision lay outside the range of principled outcomes.
Further, the trial court’s discretionary decision in this case differs from that of the trial court in United States v Grant, 256 F3d 1146, 1155 (CA 11, 2001), on which the dissent relies. In Grant, a co-conspirator never testified because he had been deported before the trial took place. Id. at 1153. The co-conspirator’s previous, arguably inculpatory statements were read into the record; the statements circumstantially linked the defendant to the conspiracy but did not directly name him as a conspirator. Id. at 1152-1153. At trial, defense counsel properly moved under FRE 806 for admission of exculpatory statements the co-conspirator made after he had been deported, in which he affirmatively claimed *468 that the defendant was uninvolved. Id. at 1153.[21] The trial court denied the motion, ruling that the exculpatory statements were not actually inconsistent with the co-conspirator’s earlier, circumstantially inculpatory statements. Id. The Eleventh Circuit Court of Appeals reversed, concluding that the trial court’s view of inconsistency was too narrow and that the exculpatory statements would have significant probative value with regard to the credibility of the purportedly inculpatory statements. Id. at 1153-1155.
The circumstances of Grant differ from those of the case before us in crucial respects. First, the exculpatory statements in Grant were significantly more probative because they appear to have been the co-conspirator’s only exculpatory statements. For this reason, in contrast to the instant case, they were not cumulative. Second, although the prosecutor in Grant observed on appeal that the exculpatory statements were unreliable because they were made only after the co-conspirator was deported, the trial court in Grant did not find that the co-conspirator explicitly attempted to manipulate the trial process by injecting collateral issues into the trial or gained an advantage by changing his story. Rather, as noted earlier, the court concluded that the statements did not directly contradict each other. In sum, without regard to whether we agree with the Grant court’s holding, we conclude that Grant is distinguishable.[22]
*469 Most significantly, even if the trial court in this case erred, any error was harmless under each of the potentially applicable standards of review. The harmless error analysis employed by the Court of Appeals was clearly erroneous for several reasons. On remand, when considering the effect of any error on the remaining evidence presented at trial, the Court reasoned:
Lamp’s testimony would be subject to the utmost scrutiny, given his undisputed involvement in the murder, his plea agreement, and defendant’s theory, supported by many of the impeaching statements that were not admitted, that Lamp had done the shooting himself. Further, much of the interlocking testimony concerned the allegation that defendant killed Miller and cut off his ear at the direction of drug dealer Benny Williams. However, police testified that they had no evidence connecting Williams to the murder, Williams testified that he did not know Miller and had not received one of his ears, and police also testified that there was no physical evidence indicating that Miller’s ear had been cut off. Regarding Mock and her sister, there was testimony that they and defendant were always drinking when they were together. Further Mock, her sister, and Z[a]ntello, who was supposedly present during some of the discussions, gave differing accounts of what defendant said. Lastly, we conclude that the evidence overwhelmingly supported that defendant knew something about the murder, but his role, and the extent of his knowledge and participation or assistance, largely depended on Simpson’s testimony.[23]
First and foremost, the court erred as a matter of law by considering the recanting statements for improper purposes. It erroneously concluded that defendant’s theory that Lamp committed the shooting without defendant’s aid would have been supported “by many of the im *470 peaching statements that were not admitted, that Lamp had done the shooting himself.” To the contrary, had the statements been admitted, they could not have been directly considered as evidence in favor of the defense theory. They could have been used only for the purpose of impeaching the credibility of Simpson and Zantello.[24] MRE 806. Thus, at the very most, the statements would have caused the jury to discredit entirely Simpson’s and Zantello’s testimony inculpating defendant. The remaining untainted evidence — in the form of testimony from Lamp, Mock and Barr — alone established beyond a reasonable doubt that defendant was at least an accomplice to first-degree, premeditated murder.
The Court of Appeals mischaracterizes the untainted evidence by essentially dismissing the very significant testimony of Mock and Barr. The sisters both described a specific night and location at Lion’s Park where defendant tearfully apologized and admitted to them that he had participated in Miller’s murder.[25] Mock recalled that defendant specifically told her that defendant pulled the trigger and cut off Miller’s ear. Barr recalled defendant saying that defendant was present at the murder but thought that he said Lamp had pulled the trigger. Barr also testified that, around the time of the murder, she had been at someone’s house and “they were saying that Charles’ ear was in the freezer.” Most significantly, Mock attested that, in April 1990, in light of defendant’s confessions, Mock convinced him that he should speak with the police. Defendant initially agreed *471 to do so the next day. Mock called the police and told them about defendant’s admissions but, by the time the police contacted defendant, he refused to provide them any details. Michigan State Police Detective Sergeant Dana Averill confirmed that Mock contacted the police and that Mock, Barr, and Zantello gave statements regarding defendant’s admissions.[26] Overall the substantially consistent testimony of Mock and Barr, which was confirmed in part by Averill’s testimony, provided strong evidence against defendant. Significantly, their testimony also directly corroborated Lamp’s testimony and added to his credibility. The Court of Appéals clearly erred when it simply discounted their testimony because they were “always drinking when they were together” and “gave differing accounts of what defendant said.”[27]
*472 Finally, because Zantello’s and Simpson’s recantations could not have been introduced for their truth, defendant still would have been left to rely on the defense theories that he presented at trial to cast doubt on the consistent testimony from Lamp, Mock, and Barr. His primary alibi defense depended solely on the testimony of his three sisters, which was suspect because of their obvious bias in favor of their brother. Defendant also relied, as does the dissent, on Williams’s unsurprising testimony that, although Williams was a “fairly large-scale cocaine dealer” at the time of Miller’s murder, he did not commission the murder. A police officer also attested that the police were unable to link Williams to the crime. But, significantly, even the defense conceded in closing argument that Miller planned to steal from Williams; the defense simply argued that Lamp, “having heard Mr. Miller. . . was going to steal from Benny Williams, fearing that he, Mr. Lamp, was next, he decided that Miller had to die first.” Regarding the lack of physical evidence establishing that Miller’s ear had been cut off, all parties agreed that Miller’s remains were skeletal and that most of the soft tissue had decayed. Contrary to the implications of defendant and the dissent, no testimony or physical evidence affirmatively suggests that Miller’s ear was not severed. The defense also attempted to divert the jury from Lamp’s description of the crime by presenting several experts who opined that Miller may have been killed by blunt force, rather than by a bullet. Yet Lamp himself testified that Lamp had access to guns and therefore encouraged defendant to shoot Miller instead of beating him to death, that Lamp provided the gun defendant used to kill Miller, and that Lamp sold the gun after the crime. Therefore, the defense theory that Miller was beaten, rather than shot, did little to inculpate Lamp and exculpate defendant.
*473 In sum, the volume of untainted evidence against defendant was significant. The facts do not cast reasonable doubt on the prosecutor’s theory of the case. In particular, nothing in the record suggested that Mock and Barr had any motive to falsely implicate defendant. They came forward early in the investigation, and the details and timing of their testimony were directly confirmed by the police. Although Zantello’s and Simpson’s original inculpatory testimony certainly would strengthen the prosecution’s case, their testimony was not critical for the prosecution because defendant’s culpability was clearly established by the other witnesses. Moreover, because the jury had already heard the evidence impeaching Simpson and Zantello that was offered at the first trial, and had obviously chosen to disregard it, the likelihood that the jury would have been convinced by cumulative impeachment evidence was slight in light of the fact that Simpson’s and Zantello’s inculpatory testimony so clearly coincided with the untainted evidence. In light of the volume of untainted evidence against defendant, any error did not affect the outcome of the case.
conclusion
We hold that the trial court did not abuse its discretion when it denied defendant’s motion for a new trial on the basis of defendant’s argument that MRE 806 required admission of Simpson’s and Zantello’s highly prejudicial and cumulative recantations. Further, any error would also have been harmless under any of the potentially applicable standards of review. The Court of Appeals erred as a matter of law by considering the recantations for the truth of the matters asserted, instead of as impeachment of the recanting witnesses’ testimony, and improperly dismissed the testimony of two key prosecution witnesses. For these reasons, we *474 reverse the judgment of the Court of Appeals and remand the case to that court for consideration of defendant’s remaining issues on appeal.
Taylor, C.J., and Weaver and Young, JJ., concurred with Corrigan, J.

 Because the trial court acknowledged that it had incorrectly informed the first jury about the nature of a codefendant’s plea agreement, it granted defendant’s first motion for a new trial.

 Zantello submitted a sworn and notarized statement. Simpson signed his statement, which included his assertion that the allegations therein were true, but his statement was not sworn and notarized.

 MRE 806 states:
When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant’s hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination. [Emphasis added.]

 People v Blaekston, unpublished opinion per curiam of the Court of Appeals, issued January 18, 2005 (Docket No. 245099) (Blackston I), pp 5-8, vacated 474 Mich 915 (2005).

 Id. at 9.

 People v Blackston, 474 Mich 915 (2005).

 People v Blackston (On Remand), unpublished opinion per curiam of the Court of Appeals, issued May 24, 2007 (Docket No. 245099) (Blackston IT).

 480 Mich 929 (2007).

 People v Carines, 460 Mich 750, 774; 597 NW2d 130 (1999); Blackston I, supra at 9 n 3.

 Carines, supra at 774; Blackston I, supra at 9 n 3 and accompanying text.

 474 Mich 915 (2005).

 Under the plain error standard, defendant would be obliged to show that (1) an error occurred, (2) the error was plain or obvious, and (3) the error affected the outcome of the trial. Carines, supra at 763. Reversal is then warranted only if defendant is actually innocent of the crime or if the error “ ‘seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings ....’” Id., quoting United States v Olano, 507 US 725, 736; 113 S Ct 1770; 123 L Ed 2d 508. (1993) (internal citation omitted; brackets in original).

 People v Cress, 468 Mich 678, 691; 664 NW2d 174 (2003).

 People v Babcock, 469 Mich 247, 269; 666 NW2d 231 (2003).

 The dissent asserts, and the prosecution appears to assume, that defendant moved for admission under MRE 613. Post at 479 n 5,493. The trial transcript reveals to the contrary that defendant did not cite any court rules. In the face of his failure to cite any authority, the trial court itself cited MRE 613 among its reasons for denying defendant’s motion.

 We fail to see the relevance of the dissent’s suggestion that “[i]t is undisputed that if Simpson and Zantello had testified against defendant at his second trial, the statements at issue here would have been admissible as prior inconsistent statements.” Post at 482. We cannot know what testimony Simpson and Zantello would have given if they had testified at the second trial. It is pure speculation to assume that the content of their testimony would have justified admission of their recantations. Further, we have no reason to assume that their recantations’ admissibility under these hypothetical circumstances would be “undisputed.” To the contrary, the extent of their admissibility would be debatable and even the admissible portions would be carefully considered under MRE 403.

 See, e.g., Vaughn v Willis, 853 F2d 1372, 1379 (CA 7, 1988); Arizona v Huerstel, 206 Ariz 93, 104; 75 P3d 698 (Ariz, 2003); cf. United States v Grant, 256 F3d 1146, 1155 (CA 11, 2001) (requiring admission of evidence under FRE 806 but leaving open whether FRE 403 may sometimes bar evidence otherwise admissible under FRE 806).

 The court also opined that Simpson had consistently attempted to manipulate the trial process by recanting but then engineering his own absence. Simpson recanted only after receiving the benefit of immunity from prosecution and then would not cooperate with the judge at the retrial lest he lose that immunity. Before the retrial, Simpson wrote to the judge that he would refuse to testify. He ultimately appeared before the court, but the court declared him unavailable after he refused to take the stand.

 Indeed, as the dissent notes, post at 475 n 1, Simpson confirmed that he accused defendant of the murder each time Simpson testified under oath; he accused defendant under oath in response to an investigative subpoena as well as at the first trial. Simpson asserted that defendant was not present at the murder only in unsworn, out-of-court statements.

 Significantly, as will be discussed further infra, the central error of the Court of Appeals’ analysis is that it considers the statements’ contents for their truth, rather than merely for impeachment purposes.

 Thus, in contrast to the case before us, defense counsel contemporaneously argued for admission under FRE 806 at trial. Yet the prosecutor did not argue that admission created undue prejudice until the issue was reviewed on appeal. Id. at 1155.

 We agree with the dissent that the facts of Vaughn v Willis, 853 F2d 1372, 1379 (CA 7, 1988), are not perfectly comparable to those of the instant case. Here, the facts fall on a spectrum somewhere between those of Grant and those of Vaughn. But the mere fact that the unique *469 circumstances of this case and those of Vaughn are different in no way requires the conclusion that the trial court abused its discretion here.

 Blackston II, supra at 9.

 The dissent similarly errs when it asserts that the content of the recantations would have supported defendant’s claim of innocence instead of being used only to undermine the credibility of Zantello and Simpson. See, e.g., post at 491.

 Defendant confessed twice: once at Lion’s Park, to Mock and Barr, and on a separate occasion to Mock and Zantello at Zantello’s house after defendant had moved out of the house.

 Averill also spoke to defendant at that time and testified that defendant never specifically denied his involvement but was uncooperative and said something like, “When the time comes, the truth will come out and I’ll tell you when I’m ready.”

 The dissent also discredits the testimony of Mock and Barr. But, contrary to the dissent’s implications, their testimony was consistent with regard to defendant’s critical admissions that he was present during and directly involved in the murder. For example, Barr did come to believe that defendant cut off Miller’s ear; she simply could not remember whether defendant or someone else had first told her this. She admitted that she remembered only “pieces” of defendant’s confession to her and Mock because she had been drinking at the time. The dissent also emphasizes that Mock was a suspect during the investigation of Miller’s death. Post at 490. But there is no reason to conclude that the jury would have entirely discredited Mock’s testimony for this reason. As Mock explained during her testimony, Mock had been a suspect but she had not been singled out by the police; rather, she explained that “ [everybody was” a suspect at the time. Overall, the dissent focuses on minor discrepancies among the details of Mock’s and Barr’s testimony. But such discrepancies are unsurprising when the testimony occurred a decade after the relevant events and conversations took place. The jury had reason to credit their testimony precisely because of the substantial similarity of their memories of the relevant events despite this significant lapse in time.