*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRAD COURNAYA,

Defendant-Appellant.

UNPUBLISHED
November 18, 2025
10:43 AM

No. 368093
Ingham Circuit Court
LC No. 21-000303-FC

Before: GADOLA, C.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial conviction of one count of first-degree murder, MCL 750.316(1)(a). The trial court sentenced defendant as a habitual offender, third offense, MCL 769.11, to life in prison without parole. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case involves the disappearance and presumptive death of Krista Lueth, who was last seen alive on November 11, 2008, and whose body was never recovered. In 2008, Lueth, then 34 years old, lived in the upstairs apartment of a house on Eureka Street in Lansing with her cat, Moey. Lueth was taking classes in entomology and horticulture at Michigan State University (MSU), as well as working part-time for a civil engineering consulting firm and volunteering and taking classes in gardening at the Hunter Park Community Gardens in Lansing.

Todd Olson is defendant's cousin. According to Olson, he and Lueth had a sexual relationship for several years, despite Olson being married with children. Olson introduced Lueth to defendant in 2007, and defendant and Lueth began dating shortly thereafter. Defendant moved in with Lueth in the spring of 2008. Both Olson and defendant had permission from the owner to hunt deer on a 40-acre parcel of property on Gunnell Road in Dimondale (the Gunnell Road property).

On November 6, 2008, defendant used Lueth's credit card to pay 300 dollars for a 45-minute call to a pay-by-the-minute adult entertainment phone line. Defendant made this call from a cell phone with a number ending in 1036. Defendant owned another cellular phone with a

-1-

number that ended in 2637. Defendant and Lueth broke up on or around that day; defendant then moved his belongings out of Lueth's apartment and moved in with his mother, Donna Cournaya, in Mason. Donna testified that defendant told her that he and Lueth broke up because they "just didn't get along." Defendant wrote Lueth a check for 300 dollars on November 6. Richard Stilgenbauer, who rented the downstairs apartment at the Eureka Street home from Lueth, testified that defendant seemed calm while removing his belongings from the upstairs apartment.

Also on November 6, 2008, Lueth called Olson and told him she wanted to end their relationship. Lueth also contacted End Violent Encounter (EVE), an organization in Lansing that primarily provides resources and advocacy for victims of domestic violence, and asked for information about obtaining a personal protection order (PPO), although EVE's records did not reflect the specific content of the call.

Lueth had dinner with a friend, Murray Stewart-Jones, on November 7, 2008. Stewart-Jones testified that Lueth had sent her a text message saying that she had broken up with defendant. Stewart-Jones had the impression that Lueth was "just kinda getting her life back together and doing good in school and that kind of thing." Stewart-Jones described Lueth as "lookin' good" and that she seemed like "she was heading in the right direction." Stewart-Jones and Lueth had brunch the following day.

Lueth and defendant met at Leo's Lodge, a restaurant in Lansing, in the afternoon or early evening of November 10, 2008, after which defendant dropped Lueth off at her work. Later that evening, Lueth sent her supervisor an email discussing work matters. The email indicated that Lueth had accepted an internship offer from a professor at MSU and discussed Lueth's plan to "tie up all the loose ends" on projects she was working on at the firm before MSU's classes started the following semester. Lueth and her supervisor had plans to drive to Ann Arbor on November 15th to meet with surveyors regarding a project.

On the day of Lueth's disappearance (November 11th), she paid two utility bills and made a small purchase at Bruegger's Bagels in East Lansing. She attended a lab session of her entomology class, took an exam, and took her partially-completed insect collection project home to work on over the weekend. She had a phone conversation with her supervisor discussing the trip to Ann Arbor planned for the 15th. Defendant (using his phone with the 2637 number) and Lueth exchanged several text messages on November 11, and defendant called Lueth six times between 4:08 and 4:43 p.m., with the majority of those calls appearing to go to voicemail or otherwise going unanswered. Lueth called defendant's cellular phone from her cellular phone at 5:11 p.m.; this was the last call ever made on her phone.

Lueth did not attend a gardening class at Hunter Park at 5:30 p.m., despite having made plans with the community garden director to do so. According to the director, Lueth had a perfect attendance record before November 11, 2008. Neither Lueth's nor defendant's phone made any calls or connected to any cell towers between 5:11 p.m. and 7:10 p.m. Lueth's phone received an incoming call at 8:03 p.m., which was not answered; the phone connected to a cell tower near US-127 South and College Road. Lueth's phone never connected to another cell tower. Defendant's phone connected to this same tower at 8:14 and 8:16 p.m., when defendant phoned Olson twice; these calls had a combined duration of 315 seconds (five minutes, fifteen seconds). Olson testified at trial that defendant told him that a wheel on his truck had "locked up," and that defendant asked

him for help. Olson testified that he did not know why defendant would call him, as he was not a car expert and had no special tools or expertise that would have aided defendant. Olson recalled that he told defendant to call a tow truck, but he did not remember whether defendant told him that one was already on its way. Olson claimed not to remember what else he and defendant discussed during the two calls.

Ingham County Sheriff's Deputy Eric Jungel was on road patrol on the night of November 11, 2008. He observed a truck pulled off the road on US-127 South near College Road. Although Deputy Jungel had no independent memory of the incident by the time of trial, he had recorded in his daily log that he stopped for a "motorist assist" at 8:05 p.m. The license plate number Deputy Jungel recorded indicated that the truck belonged to defendant. Deputy Jungel contacted a towing company and left at 8:10 p.m. Records from the towing company indicated that the vehicle was towed to Donna's house in Mason.

Lueth was never seen or heard from again. She did not attend her entomology class the following day despite having never missed a class, and she did not show up for work. She never contacted any of her friends or family and never accessed any of the funds in her bank account or used her credit card. Defendant never called Lueth's phone after November 11, 2008. Stewart-Jones entered Lueth's apartment on November 14, 2008 after discussing Lueth's disappearance with Lueth's father and growing concerned. Stewart-Jones discovered Lueth's cat in Lueth's apartment with no food or water. Lueth's personal belongings and toiletries were still in the apartment. Lueth's father reported her to the Michigan State Police (MSP) as a missing person on November 15, 2008.

Donna testified that defendant borrowed her car on November 12, 2008, after dropping her off at work. According, to Donna, defendant returned the car covered in mud. Although Donna could not remember asking defendant to do so, defendant had purchased two new rear tires for her car, despite being unemployed and needing repairs for his own vehicle. Olson sent a text message to defendant's phone at 9:50 a.m.; when defendant's phone received this message, it connected to a cell tower near the Gunnell Road property. Olson left work early, shortly after noon; Olson testified that he had had a migraine.

On November 13, 2008, defendant made an obscene phone call to a woman, using the phone with the 1036 number (which he had used to purchase phone sex on November 6). The woman reported the call, and a detective from Meridian Township Police Department (MTPD) interviewed defendant about the call on November 14, 2008. Defendant initially claimed that the phone used to make the obscene call had been stolen; however, he later admitted to making the call before throwing the phone in a dumpster. Defendant also stated that he had changed his other phone's SIM card on November 13, changing the phone number from one ending in 2637 to one ending in 8250. The MTPD detective was not aware of Lueth's disappearance at the time of the interview.

Officers from the MSP interviewed defendant on November 15 and November 19, 2008. Defendant denied having any contact with Lueth after dropping her off at work on November 10. When asked about his phone numbers, defendant claimed to only have a land line at Donna's house and a cell phone with a number ending in 8250. Defendant did not mention his phone with the 1036 number, or the fact that he had recently changed his other phone's number. Defendant

was vague about his whereabouts on November 11 and did not mention that his truck had broken down that evening on US-127 South.

MSP officers found two handwritten letters from defendant to Lueth in Lueth's apartment and mailbox. The letters indicated that defendant wanted to get back together with Lueth and asked Lueth to forgive him for unspecified bad behavior. Officers also found Lueth's work phone, checkbook, and a new credit card.

The investigation into Lueth's death continued periodically from 2008 until 2021. Both defendant's and Donna's vehicles were searched, and several spots in both tested positive for human blood via preliminary testing, although samples taken from these spots revealed no usable DNA. In 2009, MSP detectives located records of Deputy Jungel's motorist assist of defendant's truck. When officers searched the area of the highway where defendant's vehicle had broken down, they discovered Lueth's identification, debit card, and her cellular phone. The phone had been broken into several pieces. The Gunnell Road property was searched with a cadaver dog; the dog alerted on a culvert on the property, where charred wood was ultimately discovered. A neighbor recalled seeing two men having a fire in the culvert around the opening of deer hunting season in 2008; deer season opened on November 15 that year. Near the culvert, investigators found defendant's and Lueth's names carved into a tree, along with a heart and "2008."

Defendant's and Lueth's phone records and cellular data were analyzed, allowing the investigating officers to determine which cell tower each of their phones had connected to during the relevant time period. Data was able to be extracted from Lueth's broken phone, allowing the recovery of some of her voicemail, email, and text messages, as well as pictures.

In 2020, defendant's ex-wife provided the MSP with two emails written to her by defendant, in which he made reference to a "reward" of $200,000, told her to "keep your sweet mouth shut," and told her that if she wanted defendant to "look out for you and tell you some secrets that will get you a ton of money," then she needed to provide him with sexually explicit pictures of her and another woman. Lueth's father had previously offered a reward for information regarding Lueth's disappearance or death, although the amount was $100,000 at its highest point in 2013, and the reward offer had been rescinded in 2017.

The Ingham County Probate Court issued a presumptive death certificate for Lueth in 2016. In 2021, an MSP intelligence analyst performed an extensive search of state and national databases for any information concerning Lueth, and found no indication that she was alive after November 11, 2008.

In 2021, defendant was arrested and charged with open murder. Prior to trial, the prosecution moved to admit other-acts evidence at trial. Specifically, the prosecution sought to introduce evidence that (1) defendant had used Lueth's credit card on November 6, 2008 to purchase phone sex, and (2) defendant had made an obscene phone call on November 13, 2008. The prosecution stated that it intended to offer the evidence concerning the phone sex purchase to show defendant's identity, motive, and intent; it intended to offer the evidence concerning the obscene phone call and defendant's destruction of that phone on November 13 to show defendant's destruction of relevant evidence and consciousness of guilt. The trial court granted the prosecution's motion.

-4-

A nine-day jury trial was held in June 2023. Defendant did not testify and presented no evidence or witnesses. He was convicted and sentenced as described. This appeal followed.

## II. OTHER-ACTS EVIDENCE

Defendant argues that the trial court erred by granting the prosecution's motion to admit other-acts evidence. We disagree. This Court reviews for an abuse of discretion a trial court's decision to admit other-acts evidence. See *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998); *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009). A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes. *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007).

MRE 404(b) governs the admission of evidence of other crimes, wrongs, or acts, and provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case. [MRE 404(b)(1).]

The rule of MRE 404(b)(1) is a rule of inclusion—it allows the admission of other-acts evidence for any relevant purpose *other than* to when it is offered solely to show the criminal propensity of a defendant to establish that he acted in conformity therewith. See *People v VanderVliet*, 444 Mich 52, 63-65; 508 NW2d 114 (1993), mod 445 Mich 1205 (1994).

Our Supreme Court has established a four-part analysis a trial court should conduct when determining whether proffered other-acts evidence should be admitted in a criminal proceeding. See *VanderVliet*, 444 Mich at 74, see also *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). First, the trial court must determine whether the prosecution has offered the evidence for a proper purpose. *VanderVliet*, 444 Mich at 74. Second, the trial court must determine whether the proposed evidence is relevant to a material issue or fact of consequence in the case. *Id.* Third, the trial court must determine whether the danger of unfair prejudice substantially outweighs the probative value of the other-acts evidence. *Id.* at 74-75. Fourth, the trial court must, upon request, provide a limiting instruction to the jury regarding the proper use of the admitted other-acts evidence. *Id.* at 75.

The prosecution bears the initial burden of articulating a proper purpose for the admission of the other-acts evidence at issue; in other words, the evidence must be offered for some purpose other than to show that a defendant's bad character made him more likely to have committed the offense(s) for which he was charged. *Id.* at 75. MRE 404(b)(1) lists several relevant bases for the admission of other acts evidence, including to "prove motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." Our Supreme Court has held that this list is not exhaustive. *People v Sabin (After Remand)*, 463

Mich 43, 56; 614 NW2d 888 (2000); *People v Engelman,* 434 Mich 204, 212; 453 NW2d 656 (1990).

In this case, the prosecution offered the evidence that defendant had used Lueth's credit card to support its theory concerning motive and intent, specifically that Lueth had broken up with defendant upon discovering he had used her card to purchase 300 dollars of phone sex. The prosecution offered the evidence that defendant had made an obscene phone call three days after Lueth's disappearance to show that defendant owned, and had destroyed, the cellular phone that had called the phone sex line on November 6, 2008, and had made inconsistent or contradictory statements to police about how many cellular phones and phone numbers he had, demonstrating consciousness of guilt. These are proper purposes for the admission of other-acts evidence under MRE 404(b)(1). See *VanderVliet*, 444 Mich at 74. Accordingly, the trial court did not err by holding that the prosecution had offered the evidence for a proper, non-propensity purpose.

If the prosecution has offered other-acts evidence for a proper purpose, the trial court must then determine whether the proposed evidence is relevant to an issue of fact that is of consequence at trial. *VanderVliet*, 444 Mich at 74; see also MRE 401, 402; see also MRE 104(b). The trial court must closely scrutinize the logical relationship between the evidence and the fact in issue. *Orr*, 275 Mich App at 739.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; see also *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012). The determination of the relevance of evidence involves two elements: materiality and probative value. See *People v Henry*, 315 Mich App 130, 144; 889 NW2d 1 (2016); *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 667; 819 NW2d 28 (2011). Evidence is material if it is related to a disputed issue of consequence at trial; however, material evidence need not relate specifically to an element of the charged crime or an applicable defense. *People v Brooks*, 453 Mich 511, 518; 557 NW2d 106 (1996). "Probative force is the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v Mills*, 450 Mich 61, 68; 537 NW2d 909 (1995) (quotation marks and citation omitted), mod 450 Mich 1212 (1995). In a criminal trial, a defendant's general denial of guilt puts at issue all elements of the charged offense. See *Sabin (After Remand),* 463 Mich at 60.

Regarding the evidence that defendant had used Lueth's card to purchase phone sex, and that she had ended the relationship as a result, evidence of motive is always relevant in a criminal prosecution, and other-acts evidence may be admitted if relevant to prove motive. See *People v Rice (On Remand)*, 235 Mich App 429, 440; 597 NW2d 843 (1999); *People v Hoffman*, 225 Mich App 103, 105-106; 570 NW2d 146 (1997). Evidence of a history of relationship discord between a defendant and a murder victim is relevant to prove premeditation and motive to kill the victim. *People v Fisher*, 449 Mich 441, 453; 537 NW2d 577 (1995); see also *People v Fisher,* 193 Mich App 284, 289; 483 NW2d 452 (1992); *People v Hoffman*, 225 Mich App 103, 110; 570 NW2d 146 (1997). And motive is highly relevant when, as here, the proofs are primarily circumstantial. See *Fisher*, 499 Mich at 453. Although defendant argues that the prosecution's theory that defendant killed Lueth because of the breakup is "illogical" in light of other evidence, such as the evidence that defendant was calm when moving his belongings out of Lueth's apartment, or the fact that

-6-

defendant and Lueth ate together on November 10, 2008, these arguments go to the weight of the evidence, not its admissibility. See *Fisher*, 449 Mich at 453 ("Whether the marital discord is of a type that would provide a motive for murder is an issue of weight, not admissibility."). This evidence was also relevant to establish premeditation and deliberation. See *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999) (stating that evidence that tends to establish premeditation includes "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide," among other factors).

Regarding the evidence that defendant made an obscene phone call shortly after Lueth's disappearance, cellular data and cellular phone contacts were significant issues at trial. Evidence that defendant had possessed a cellular phone that he had not initially disclosed to the police investigating Lueth's disappearance, that he had given inconsistent statements to police regarding his cellular phone ownership and use, and had destroyed that phone a few days after Lueth's disappearance, was relevant to the issue of defendant's cellular phone ownership and use and to explain the investigation into Lueth's disappearance. This evidence was also relevant to defendant's consciousness of guilt. See *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008); *Abraham*, 234 Mich App at 656. Accordingly, the trial court did not err by holding that the challenged other-acts evidence was relevant to a proper purpose.

Even other-acts evidence that is relevant to a proper purpose may be excluded under MRE 403 if its probative value is substantially outweighed by the danger of unfair prejudice. Unfair prejudice does not arise merely because evidence is damaging; all relevant evidence will be damaging to a party's case to some extent. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995); *Lewis v LeGrow*, 258 Mich App 175, 199; 670 NW2d 675 (2003). Unfair prejudice exists when there is a tendency that minimally probative evidence will be given undue or preemptive weight by the jury, or when it would otherwise be inequitable to allow use of the evidence. *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008); see also *People v Starr*, 457 Mich 490, 503; 577 NW2d 673 (1998) (stating that, in order to be unfairly prejudicial, the evidence must be such that there would be a danger that it would stir the jurors to such passion that they would be swept beyond rational consideration of the defendant's guilt or innocence).

> Assessing probative value against prejudicial effect requires a balancing of several factors, including the time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*Blackston*, 481 Mich at 462.]

In this case, the other-acts evidence was probative of defendant's motive, premeditation, and consciousness of guilt; additionally, the evidence concerning defendant's possession of, destruction of, and inconsistent statements concerning a cellular phone were relevant to providing a complete explanation of the investigation into Lueth's disappearance. The probative value of this evidence was not substantially outweighed by the risk of unfair prejudice. *Mills*, 450 Mich at 75. The presentation of the other-acts evidence occupied a relatively small portion of the nine-

day jury trial, and there was little risk that the jury would become confused or misled by that evidence when considering the elements of first-degree murder. *Blackston*, 481 Mich at 462. Further, the prosecution did not provide specific details regarding the content of defendant's obscene phone call, nor did it provide specifics concerning the phone sex line called by defendant, other than to refer to it as such and provide evidence that the bill was three hundred dollars. Additionally, the trial court provided a proper limiting instruction to the jury concerning this evidence, further safeguarding defendant's rights. See *People v Roper*, 286 Mich App 77, 106; 777 NW2d 483 (2009). Defendant does not challenge the adequacy of the instruction and has not provided this Court with any reason to believe that the jury did not follow its instructions. See *People v Zitka*, 335 Mich App 324; 966 NW2d 786 (2020) (noting that jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors).

The trial court did not abuse its discretion by granting the prosecution's motion to admit other-acts evidence. *Crawford*, 458 Mich at 383.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant also argues that the evidence at trial was insufficient to support his conviction of first-degree premeditated murder. Specifically, defendant argues that the prosecution failed to present sufficient evidence that Lueth was dead, that her death was a result of homicide, and that defendant had committed that homicide. We disagree. This Court reviews de novo a sufficiency-of-the-evidence claim, *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016), examining the evidence in the light most favorable to the prosecution to determine whether sufficient evidence has been presented to allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt, see *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013).

Due process of law requires that the prosecution in a criminal case introduce sufficient evidence of each element of the offenses charged to justify a rational factfinder in finding the defendant guilty beyond a reasonable doubt. See *People v Nowack,* 462 Mich 392, 399; 614 NW2d 78 (2000). "A prosecutor need not present direct evidence of a defendant's guilt. Rather, '[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime.' " *People v Williams,* 294 Mich App 461, 471; 811 NW2d 88 (2011) (alteration in original), quoting *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). A defendant's intent may be inferred from circumstantial evidence; "[b]ecause it is difficult to prove an actor's state of mind, only minimal circumstantial evidence is required." *People v McGhee*, 268 Mich App 600, 623; 709 NW2d 595 (2005). "Even in a case relying on circumstantial evidence, the prosecution need not negate every reasonable theory consistent with the defendant's innocence, but need merely introduce evidence sufficient to convince a reasonable jury in the face of whatever contradictory evidence the defendant may provide." *People v Hardiman*, 466 Mich 417, 423-424; 646 NW2d 158 (2002) (quotation marks and citation omitted). The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Nowack*, 462 Mich at 400.

The elements of first-degree murder are (1) the intentional killing of a human being (i.e., second-degree murder) (2) with premeditation and deliberation. *People v Bass*, 317 Mich App 241, 265-266; 893 NW2d 140 (2016). The elements of second-degree murder are "(1) a death, (2)

caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009) (quotation marks and citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.*

Premeditation and deliberation are separate elements, but the same facts may tend to establish each element. *People v Oros*, 502 Mich 229, 241; 917 NW2d 559 (2018).

> The Legislature did not explicitly define the meaning of premeditation and deliberation. However, we have recognized the ordinary meaning of the distinct and separate terms as the following: "[t]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." [*Id.* at 240, quoting *People v Woods*, 416 Mich 581, 599 n 2; 331 NW2d 707 (1982) (additional quotation marks and citation omitted).]

Premeditation and deliberation are "subjective factors usually incapable of direct proof absent an admission or confession by the defendant." *Oros*, 502 Mich at 241. Premeditation and deliberation may be inferred from circumstantial evidence. *Bass*, 317 Mich App at 266. Although the inferences supporting premeditation and deliberation "cannot be arrived at by mere speculation," see *id.* (citation omitted), "[s]ince the distinguishing elements of first-degree murder ultimately resolve themselves into questions of fact, minimum standards of proof, if reasonably related to the circumstances which must be proved, will serve to preserve the distinction between first-degree and second-degree murder," *Oros*, 502 Mich at 241 (citation omitted). "[W]hen considering a sufficiency-of-the-evidence issue, the question is whether the evidence introduced at the trial fairly supports an inference of premeditation and deliberation." *Id.* at 242 (quotation marks and citation omitted).

A victim's body is not necessary to establish that he or she was killed; however, in a prosecution for murder without a body, the fact of the victim's death is an element that the prosecution must prove. *People v Lane*, 308 Mich App 38, 58; 862 NW2d 446 (2014); *Fisher*, 193 Mich App at 287.

Regarding Lueth's death, the evidence showed that Lueth was extremely conscientious about attending her academic classes and was considered very reliable by her employer and the director of the garden where she volunteered. Moreover, the evidence showed that Lueth never used any of her financial instruments again after November 11, 2008, never attempted to access the funds in her bank accounts or retirement account, and never attempted to replace the identification found by the side of the road on US-127. Personal items, clothes, and toiletries were found inside her apartment. Numerous witnesses testified that Lueth cared deeply for her cat and would not have left it to starve or die of thirst. Lueth never attempted to contact any of her family or friends after November 11. A rational factfinder could reasonably infer from this evidence that Lueth was dead; although there are other possible (if implausible) explanations for Lueth's apparent disappearance, the prosecution did not have to negate every theory consistent with defendant's innocence. *Hardiman*, 466 Mich at 423-424.

A rational factfinder could also have concluded that defendant had killed Lueth or caused her death. The evidence supported the inference that Lueth and defendant met on November 11, 2008 sometime after Lueth called him at 5:11 p.m., and that defendant, either accompanied by Lueth or not, drove while in possession of Lueth's phone to the area of the closest cell tower (in fact, the only nearby cell tower at the time) to US-127 and College Road. Lueth's vehicle was still at her home, and numerous witnesses testified that she did not drive, although she had a driver's license. Defendant was observed alone in his car on US-127 South near College Road a few hours later; Lueth's broken phone, license, and debit card were later recovered in that vicinity. A reasonable inference could be made that defendant was the one who discarded those items after taking them from Lueth.

Defendant's behavior immediately after Lueth's disappearance also supports an inference of defendant's guilt. Defendant never called or texted Lueth again after November 11, despite having contacted her frequently in the days between their breakup and her disappearance. Defendant changed the number of the phone he used to communicate with Lueth two days after her disappearance, and he neglected to tell the police investigating Lueth's disappearance that he had done so or about the existence of his other phone that he had destroyed. Defendant neglected to tell police that his vehicle had broken down on the 11th, despite being asked to account for his whereabouts on that day. Defendant borrowed his mother's car on November 12 and, without her asking, and despite having just had his own vehicle break down the night before, purchased two new tires for the car before returning it to his mother covered in mud. Defendant contacted Olson repeatedly on the night of November 11 and the morning of November 12; Olson called in sick from work on the afternoon of November 12, when defendant was out of the house with his mother's car. Stains found in defendant's and his mother's vehicles preliminarily tested positive for human blood, although they could not be conclusively established as such and no usable DNA was extracted from them. A cadaver dog alerted to a culvert in an area where defendant was known to go hunting; a carving of defendant's and Lueth's names and "2008" was found on a nearby tree, suggesting at a minimum that defendant had been to that particular area in 2008. Two men were observed having a fire in that location around the beginning of deer season in 2008; deer season began on November 15th in 2008. Defendant's emails to his ex-wife could be viewed as an attempt to influence her with a promise of "reward" money if she kept "her sweet mouth shut."

Although circumstantial, all of this evidence, viewed in the light most favorable to the prosecution, would enable a rational jury to conclude that defendant had caused Lueth's death. Unlike *Fisher*, the prosecution in this case provided more than evidence that defendant knew Lueth was dead—circumstantial evidence linking defendant to the area where Lueth's personal items were recovered, and defendant's post-offense behavior, support the conclusion that defendant *had* killed Lueth. *Fisher*, 193 Mich App at 288. The evidence was sufficient to support defendant's conviction for murder. *Lane*, 308 Mich App at 59; see also *People v Nelson*, 493 Mich 933, 933; 825 NW2d 581 (2013) (holding that "[e]ven absent concrete proof of a particular act causing death, the circumstantial evidence was legally sufficient, when viewed in the light most favorable to the prosecution, to prove beyond a reasonable doubt that the defendant caused the victim's death with malice").

In his brief on appeal, defendant asks, "given the totality of the evidence presented against him during his trial, what evidence supported the jury's finding that he murdered Krista Lueth with premeditation and deliberation?" He poses this question in the context of contesting the

sufficiency of the evidence "on the elements of death and identification," not premeditation and deliberation, and defendant's Statement of Questions Presented also nowhere addresses premeditation or deliberation. Nonetheless, to the extent that defendant arguably contests the sufficiency of the evidence of premeditation and deliberation, defendant has not supported this argument with facts or law. For all of these reasons, defendant has abandoned the issue. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998); *English v Blue Cross Blue Shield of Michigan*, 263 Mich App 449, 459; 688 NW2d 523 (2004). In any event, only minimal circumstantial evidence is needed to show premeditation and deliberation. *Oros*, 502 Mich at 241. And relationship discord and a defendant's actions before and after a killing can show premeditation and deliberation. *People v Walker*, 330 Mich App 378, 383; 948 NW2d 122 (2019); see also *Abraham*, 234 Mich App at 656. The evidence at trial showed that Lueth had recently broken up with defendant, that he had contacted her repeatedly via phone calls, texts, and mail after the breakup, that his phone connected to cell towers near Lueth's apartment on the day of her disappearance despite defendant claiming he could have been several places outside of Lansing, that he never tried to call Lueth after her disappearance, and that he destroyed relevant evidence and was evasive with police when questioned. The evidence fairly permitted the jury's inference of premeditation and deliberation. *Oros*, 502 Mich at 241.

Affirmed.


/s/ Michael F. Gadola
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle